## OKLAHOMA PUBLISHING CO. v. KENDALL.

No. 11109—Opinion Filed Nov. 20, 1923.

Rehearing Denied Dec. 18, 1923.

(Syllabus.)

**1. Libel and Slander — Venue of Action Against Publisher Corporation.**

Under and by virtue of section 202, Comp. Stat. 1921, a domestic corporation publishing a newspaper may be sued for libel in the county where the paper containing the libel is circulated, that being the residence of plaintiff, though the principal place of business of the corporation was in another county.

**2. Same — Construction of Words.**

Words used in an alleged libelous publication are to be construed by their most natural and obvious meaning and in the sense they would be understood by those reading the same.

**3. Same—Pleading—Imputation of Crime —Inducement.**

If an alleged libelous publication does not directly impute crime to the party, but extrinsic facts are necessary to bring out the defamatory meaning, then the law requires the allegation of such facts as inducement in order that the actionable character of words may appear.

**4. Same.**

Where plaintiff alleged, in an action for libel, that he was the superintendent of a state institution for feeble minded, and the publication contained the following: "Enid Imbeciles Die of Influenza Inadequately Treated, is Charged", held, said language, when it is given its ordinary and natural meaning, would not be understood to charge the plaintiff with the crime of manslaughter in the second degree; held, further, that the mere allegation in the petition that it was intended to charge plaintiff with said crime is not sufficient. Such allegation being a merely gratuitous conclusion of the pleader, and cannot give the words a meaning which they do not otherwise have.

**5. Same.**

A publication, to impute that an officer is guilty of a crime or misdemeanor for willful neglect of duty, must contain language that will be understood to charge the neglect was willful.

**6. Same—Classes of Libelous Words.**

Words charged to be libelous may be divided into three classes: First, those that cannot possibly bear a defamatory meaning; second, those that are reasonably susceptible of a defamatory meaning, as well as an innocent one; third, those that are clearly defamatory on their face.

**7. Same.**

Any publication in writing which holds one up to ridicule, contempt, hatred, or obloquy is libelous, even though it charges no criminal offense.

**8. Same—Words Libelous Per Se—Official Delinquency.**

The general rule is that a publication which charges a public official with neglect of official duty or incompetency in his office, or malfeasance in his office, is libelous per se.

**9. Same.**

Publication examined, and held, the publication in question was libelous per se.

**10. Same—Criticism of Public Officials.**

The right to criticize the official acts of a public official does not embrace the right to make false statements of facts or to attack his private character, or to falsely impute to him malfeasance or misconduct in office.

**11. Same.**

In an action for libel by a public official, when the defense of privileged communication on matters of public interest is presented by the issues, the plaintiff may overcome the privilege by proof that the facts commented upon were false.

**12. Same—Instructions Erroneous.**

Record examined, and held, the instructions of the court did not fairly submit the issues to the jury and were prejudicial to the rights of the defendant.

Error from District Court, Garfield County; J. C. Robberts, Judge.

Action by W. L. Kendall against the Oklahoma Publishing Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Embry, Johnson & Tolbert, for plaintiff in error.

Harry O. Glasser, McKeever & Moore, and Wright, Blinn & Gilmer, for defendant in error.

McNEILL, J. W. L. Kendall commenced this action in the district court of Garfield county, against the Oklahoma Publishing Company, a corporation, for an alleged libel published in the Oklahoma City Times on February 11, 1919, of and concerning the plaintiff as superintendent of the Institute for the Feeble Minded, a state institution at Enid, Okla. The case was tried to a jury, and a verdict rendered in favor of the plaintiff for $10,000 actual damages and $2,500 exemplary damages. From said judgment, the defendant appealed. For convenience the parties will be referred to herein as they were in the lower court.

It is first argued the trial court erred in overruling a motion to the jurisdiction, and to quash the summons. The defendant is a domestic corporation with its principal place of business at Oklahoma City, where it publishes a newspaper of statewide circulation, which has a circulation in Garfield county. The action was

filed in Garfield county, where plaintiff resides, and summons served on the defendant in Oklahoma county. Section 202, Comp. Stat. 1921, provides, in substance, that an action may be commenced against a domestic corporation in the county in which the corporation is situated, or has its principal place of business, or in the county where the cause of action or some part thereof arose.

The Constitution of California has a section very similar to the above section of our statute. The court of that state construed the Constitution in the case of Tingley v. Times-Mirror Co. (Cal.) 77 Pac. 918, and in the body of the opinion it is said:

"The liability arises where the injury occurs, and the injury in the case of libel is peculiarly at the county in which the plaintiff resides, if, as is alleged, the plaintiff has published and circulated the libelous article there; and there it is that plaintiff is most injured by the publication."

This court in the case of Oklahoma Fire Ins. Co. v. Kimple, 57 Okla. 398, 157 Pac. 317, held the above section of our statute applied to all character of actions. By virtue of the above section of the statute, the venue of the action was either in Oklahoma or Garfield county. The action being rightly brought in Garfield county, summons could be served upon the defendant in Oklahoma county. The objection to the return or service we think is without merit.

The defendant assigns and argues many errors, among which is the giving of instruction No. 7. This instruction embraces many of the points involved upon this appeal, and we will refer to this instruction first. The court in the above instruction defined libel, and advised the jury, first, that the publication was not privileged; second, was libelous per se; and, third, under the pleadings was presumed to be false.

The defendant pleaded "general denial", "absolutely privileged," "qualifiedly privileged," and other matters in mitigation of damages. As to whether the publication was privileged, both parties apparently concede that if the publication imputed crime to the plaintiff, the same was not privileged, or at least was not qualifiedly privileged. For the purpose of this case, we will concede that position correct. The plaintiff taking the position that the article was not privileged, because it imputed to plaintiff the crime of manslaughter in the second degree, and also a misdemeanor, to wit: willful neglect of official duty, was the pleading sufficient to charge or impute the plaintiff guilty of the crime of manslaughter in the second degree?

In construing the language used in a libelous publication, this court has stated as follows:

"Words used in an alleged slanderous communication or article are to be construed by their most natural and obvious meaning, and in the sense that would be understood by those to whom it was addressed."

See Kee v. Armstrong Byrd Co., 75 Okla. 84, 182 Pac. 494, 5 A. L. R. 1349; Phoenix Printing Co. v. Robertson, 80 Okla. 191, 195 Pac. 487.

The petition, after referring to certain excerpts, alleges:

"Which publication aforesaid the defendant embodied in the center thereof, or near the center, the picture of this plaintiff, without his knowledge or consent and did. on said date, cause said false and defamatory matter to be printed and published and circulated as a part thereof in said Garfield county and in an advertisement in large capital letters, practically an inch in length, entitled 'ENID IMBECILES DIE OF INFLUENZA, INADEQUATELY TREATED, IS CHARGED,' in the issue of said paper of February 11, 1919, of the Oklahoma City Times, a daily newspaper published and circulated in Garfield county, state of Oklahoma, and of general circulation therein, which said newspaper has a large circulation among the people of the city of Enid and outside of the city of Enid, in Garfield county, from whom said plaintiff derives a large amount of professional business and in whom the said people had much confidence; that the 'Enid', as so entitled, had reference to and means the city of Enid, in Garfield county and state of Oklahoma; 'that when said defendant published in said article 'Imbeciles Die of Influenza. Inadequately Treated' it meant to say and did say that plaintiff, who was then superintendent of the school for Feeble Minded at Enid, was neglecting his duty and was negligent and by reason thereof was guilty of manslaughter and when it charged the word 'neglects,' as set forth in said article, it meant to charge that the said plaintiff was negligent and was guilty of a misdemeanor."

Manslaughter in the second degree is defined by section 1745, Comp. Stat. 1921, as follows:

"Any killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

Does the publication pleaded, when given its usual and ordinary meaning, impute that the death of the inmates was caused by the "culpable neglect" of the plaintiff? It

does not directly impute the crime alleged to plaintiff. The rule applicable in such case is, if the publication does not directly impute the crime to plaintiff, but extrinsic facts are necessary to bring out the defamatory meaning, the law requires the allegation of such facts as inducement, in order that the actionable character of the words may appear. It is therefore necessary that the petition state the facts showing crime was imputed to the plaintiff.

In the case of Cook v. Pulitzer Pub. Co. (Mo.) 145 S. W. 480, the court said:

"If a publication directly imputes crime, it is libelous per se; and in such cases it is not necessary, in the statement of a cause of action thereon to plead any extrinsic facts as inducement, or to add an innuendo as to the defamatory meaning. On the other hand, if the publication is libelous per se as imputing crime, but extrinsic facts are necessary to bring out the defamatory meaning, then the law requires the allegation of such facts as inducement, in order that the actionable character of the words may appear."

In the case of Penry v. Dozier, 161 Ala. 292, 49 South. 909, it is said:

"In libel and slander the mere assertion that the defendant intended to charge a certain crime is not enough, unless the words used import unaided that he did so intend; if the words are susceptible of different meanings, one of which is libelous and slanderous, and the other innocent, or if they are ambiguous or uncertain, or if uttered ironically, the complaint must set forth enough fact to raise the implication that the offense charged was intended."

In the body of the opinion, it is said:

"While such language may be offensive and might be insulting, it charges no crime and could not reasonably be construed, standing alone, or accompanied by nothing further than appears in the letter or in the other counts, to charge a crime. * * * A mere allegation in the complaint that it was intended to charge a crime * * * cannot be sufficient. Such are merely gratuitous conclusions of the pleader, and cannot be taken to give the words a meaning which they did not otherwise have. One cannot make a thing libelous that is not in fact libelous by merely adding an innuendo."

The general rule is:

" * * * If the words alleged to have been spoken of the plaintiff, when taken in their plainest and most natural sense, and as they would be ordinarily understood, obviously import the commission of crime punishable by indictment, such words are actionable per se."

See West v. Hanrahan (Minn.) 10 N. W. 415; Keller v. Dean, 67 N. Y. Supp. 842.

The plaintiff in stating his cause of action pleaded certain portions thereof, and alleged that the phrase, "Enid Imbeciles Die of Influenza Inadequately Treated, is Charged", attempts to impute to plaintiff the crime of manslaughter. We do not think that sentence, when given its plain and most natural meaning, can be construed to charge the plaintiff with manslaughter. The phrase "Inadequately treated" is not synonymous with and is not generally understood to mean the same as "culpable neglect". The petition did not state a cause of action upon that theory.

We will next consider the question, Does the petition state a cause of action upon the theory that it imputes to plaintiff the crime of misdemeanor as defined in sections 1712 and 1713, Comp. Stat. 1921, which provide, in substance:

"One who willfully neglects to perform the duties involved upon him by law is guilty of a misdemeanor."

The portion of the petition where it alleges the publication imputed to plaintiff the crime of a misdemeanor has been heretofore copied, and the two portions of the publication where the word "neglect" is used are the following excerpts:

"(1) Mrs. Washburn was an employe of the institution for five months. She is now a resident of Enid. Mrs. Wallace, also a resident of Enid, was employed there only three days. She quit, she said, because inmates were being neglected."

"(2) Mrs. Wallace, the employe who remained at the school only three days, 'because the inmates were neglected', told me the following story."

This court in the case of Phillips v. State, 75 Okla. 46, 181 Pac. 713, defined what was willful neglect. By applying the same test to the petition as heretofore announced, and what this court has defined as willful, the petition was insufficient to plead a cause of action upon the theory that it imputed to plaintiff the crime of a misdemeanor. The instruction of the court that the publication was not privileged cannot be upheld upon the theory the publication imputed crime to plaintiff.

We will next consider whether the publication is libelous or libelous per se. This court in the case of Kee v. Armstrong Byrd Co., 75 Okla. 84, 182 Pac. 494, stated:

"Words charged to be libelous may be divided into three classes: First, those that cannot possibly bear a defamatory meaning; second, those that are reasonably susceptible of a defamatory meaning, as well as an innocent one; third, those that are clearly defamatory on their face."

Section 495, Comp. Stat. 1921, defines libel as follows:

"Libel is a false or malicious unprivileg-

ed publication * * * which exposes any person to public hatred, contempt, ridicule, or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation. * * *"

A publication to be libelous per se, or to come within the third class must contain language that would expose a person to public hatred, contempt, ridicule, or obloquy, or tend to deprive him of public confidence or to injure him in his occupation. Words that directly accuse a person of a crime come within the third classification. It is not necessary that the publication imputed crime to the party in order to come within that class.

In the case of Gordon v. N. Y. Evening Journal Pub. Co., 111 N. Y. Supp. 574, it was said:

"Any publication in writing which holds one up to ridicule, contempt, hatred, or obloquy is libelous, even though it charge no criminal offense."

In the case of Spears v. McCoy (Ky. App.) 159 S. W. 610, it was said:

"Words are slanderous per se when falsely spoken and * * * impute unfitness to perform the duties of an office or employment, prejudice him in his profession or trade, or tend to discredit him." Cook v. Pulitzer Pub. Co. (Mo.) 145 S. W. 480; Palmerlee v. Nottage (Minn.) 138 N. W. 312, 42 L. R. A. (N. S.) 870; Axton-Fisher Tobacco Co. v. Evening Post Co. (Ky. App.) 183 S. W. 269, L R A. 1916 E, page 667.

The general rule is that an article which charges a public official with neglect of official duties or incompetency in his office, or malfeasance in his office, is libelous. See Howe v. Thompson (S. D.) 150 N. W. 301; Pattangall v. Mooers (Me.) 94 Atl. 561, L. R. A. 1918 E, and annotations on page 35.

In the case of Marion v. Courier Publishing Co., 125 Ill. App. 349, it was said:

"A charge against a physician of unprofessional conduct in the treatment of a case is actionable without proof of special damage."

The publication itself contained the following heading:

"Helpless imbecile inmates of the State Institution for Feeble Minded, Enid, Okla., were permitted to die of influenza during the recent epidemic without receiving adequate medical attention from Dr. W. L. Kendall, superintendent of the institution —according to statements made to me by Mrs. Edna Wallace and Mrs. G. P. Washburn, former attendants at the institution."

And in addition contained the following excerpt:

"1. Dr. Kendall, according to the testimony of attendants and residents of Enid, spends more time at his practice in Enid than at the Institute for the Feeble Minded, although he receives a salary of $3,000 a year from the state.

"2. That, according to employes, he visits wards and buildings so infrequently that he does not know of conditions there, and that the school practically runs itself."

In describing one of the wards or rooms where certain inmates were kept, this language was used:

"As the door opened, a great blast of foul air, sickening with the odor of the closely-huddled inmates. belched out to us. It was only with an effort of the will that I was able to go into the room and remain without becoming ill."

The article recited what Mrs. Wallace, who had been formerly an employe, said the plaintiff stated, as follows:

"He also said to me, when I asked him to see the boys: 'That's the trouble with you girls. You try to take too much pains with them. You ought to herd them like hogs'."

In addition to the above, it was pleaded, the Oklahoma Publishing Company published both the Daily Oklahoman and the Oklahoma City Times, and on the 10th day of February, 1919, the Oklahoman carried the following statement or advertisement, to wit:

"TRUTH!

"The most amazing, unbelievable facts about the state of Oklahoma, revealing conditions undreamed of by the citizenry of the commonwealth, will be published by

"THE OKLAHOMA CITY TIMES

"The Times exposures, which form a story exceeding in dramatic intensity any novel ever written, will be printed serially beginning Tuesday and continuing for three weeks.

"ORDER A COPY OF THE TIMES TODAY.

"If you are not getting the Times now, drop in on your newsdealer today and tell him to reserve you the paper for a month. All Oklahoma will be reading the Times before February is out. Get the first chapter of horror Tuesday."

The extent to which newspapers and other parties may go in publishing articles is well expressed in the case of Ruhland v. Cole, 143 Wis. 367, where the court stated as follows:

"Editors or publishers of newspapers may in the columns of their papers argue in opposition to or in advocacy of any public measure like other citizens, and in doing so they are not confined within narrow limits, but outside of the restrictions of the libel law the whole compass of eloquence,

imagery, and logic is available to them. They may enter the lists of debate armed with all the weapons in the arsenal of logic, embellished with all the ornaments in the gallery of rhetoric. As was humorously but not inaccurately said in Berry v. Georgia, 10 Ga. 511, 523:

" 'Here, under the fullest inspiration of excited genius, they may give vent to their glowing conceptions, in thoughts that breathe and words that burn. Nay, more, giving reins to their imagination, they may permit the spirit of their heated enthusiasm to swing and seep beyond the flaming bounds of space and time—extra flammantia moenia mundi.'

"In this illimitable field for the exercise of their talents they have only to avoid untruthful accusations of crime or untruthful insinuations of criminal conduct and such untruthful, scandalous, and defamatory expressions as would subject the person written of to public ridicule, hatred, or contempt."

The plaintiff occupied a public position in charge of a state school for the feeble minded of the state. By reason of the class of inmates, it was a very responsible position. To charge the superintendent instructed those under him to herd the poor unfortunate inmates, entrusted to his care and keeping, like hogs, is to insinuate that he is a person of a depraved mind, and would naturally expose him to ridicule, hatred, and contempt and to deprive him of public confidence and to injure him in his occupation. We therefore conclude the publication was libelous per se within the meaning of the statute. Having concluded the publication was libelous, if untrue, but was concerning a state institution, in which the defendant and the public were interested, was the court correct, as a matter of law, in holding the publication not privileged?

We now come to a question where there is a contrariety of opinion by the different courts. In fact, it is possible to find decisions to support almost any theory advanced. Our statute defines privileged communication as follows, section 4958, Rev. Laws 1910:

"A privileged publication or communication is one made:

"First. In any legislative or judicial proceeding or any other proceeding authorized by law:

"Second. In the proper discharge of an official duty;

"Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinions in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, falsely imputes crime to the officer so criticised.

"In all cases of publication of matter not privileged under this section, malice shall be presumed from the publication, unless the fact and the testimony rebut the same. No publication which, under this section, would be privileged, shall be punishable as libel."

Publications made under the first subdivision of the statute are absolutely privileged. Those made under the second subdivision are as a general rule held to be absolutely privileged. Those under the third subdivision, in so far as they relate to reports of any legislative or judicial or other proceeding authorized by law, if fair and true, are privileged. If untrue, they may come within the qualified privilege. The above questions are not involved in this case. The question of privilege in the instant case comes within the provision of the statute which reads:

"Any and all criticism upon the official acts of any and all public officers, except where the matter stated of and concerning the official acts done, or of the officer, falsely imputes a crime to the officer so criticised."

The parties differ as to what is embraced or included in the word "criticism." Does it include the "statement of facts," upon which the criticism is based?

The publication was introduced in evidence. Preceding the article appears a statement entitled "Editor's Note", stating, in substance, that Jessie Hilton, a Times reporter, had been sent on a tour of inspection to investigate certain state institutions; she was given credentials by the Governor as an employe of each institution. That she visited each of them from top to bottom, uncovered much rottenness in some, much good in some, and some good in all. It states the first of the three installments would relate to the institution at Enid, then appears a statement the article was copyrighted, and the same was not to be republished without permission. The publication was then subdivided under the heading, to wit: "Other discoveries at Enid were", and then details certain facts. Then appears a statement of the visit made to Enid, and then under another heading, "meets housekeeper". Under another heading, "Dr. Kendall's orders". Under another, "Kendall's schedule"; another, "atmosphere hostile". Another, "Mrs. Wallace's story"; another, "Statement of Mrs. Washburn". Then certain references are made about different inmates.

It will thus be noticed that the publication alleges a certain state of facts to exist. The language in the statute appears to us to be plain, that the public and the press have a right to criticize the official acts of any and all public officials. Criticism is a discussion, or, as applicable in libel cases, a censure of the conduct or character or utterances or the official acts of the person criticised. See Belknap v. Ball, 83 Mich. 583. The statute does not attempt to say that the public or the press can falsely accuse a public official of acts which he has not done, and base its criticism upon this false premise. As stated in Belknap v. Ball, supra:

"Publications of falsehoods are never privileged. No public interest can be subserved by their publication and circulation."

Where the public or the press accuse an officer falsely, imputing that he is guilty of certain conduct, or that he has committed certain official acts, which if true would be libelous, the damage does not result from the criticism based upon those acts, but the false accusation that he has committed the act, for which he is criticised. Many of the statutes and many of the text-writers refer to "comment and criticism" or "statements" relating to libel. Our statute uses only the word "criticism". The plaintiff in error contends that the term "criticism" in the statute embraced what is known as "statement" or "comment," and under the statute the statement and criticism are absolutely privileged, unless it falsely imputed crime to the officer. In other words, You may falsely accuse an officer of doing some act in his official capacity, which would tend to subject him to ridicule, contempt, and obloquy, and to deprive him of public confidence, and then criticize him for doing that act, which in fact he had not done, simply because he was a public official. The section of the statute, in our judgment, is subject to no such construction. To give it such a construction would be to read into the statute language it does not contain.

As has often been said public officials should not be too "thin skinned," and the press and public have a right to criticize their official acts, and to this extent the officer's official acts are open to the public and the press, and they become his critics. The critics in expressing their opinion regarding his official acts or conduct may be severe, harsh, bitter, and sarcastic, for these are the weapons of the critic, but to hold that either the public or the press have a right to make false accusations against an officer, simply because he is a public officer, and then say

"We are not liable for the false accusations because you are an officer," does not seem to us to be sound.

In the case of Post Pub. Co. v. Hallam, 59 Fed. 530, it is said:

"False allegations of fact, charging a candidate for office with disgraceful conduct, are not privileged, and good faith and probable cause constitute no defense."

This is an opinion rendered by Chief Justice Taft while circuit judge and concurred in by Justice Lurton. The case is very lengthy and discussed the right of the press and the public to criticize the public acts of officials and those aspiring to public office.

In the case of Hoey v. New York Times, 138 App. Div. Rep. (N. Y.) 149, it is said:

"The rule is stated in the Cyclopedia of Law and Procedure (vol. 25, p. 401) as follows: 'The interests of society require that immunity should be granted to the discussion of public affairs and that all acts and matters of a public nature may be freely published with fitting comment or strictures. But the privilege is limited strictly to comment and criticism and does not extend to protect false statements, unjust inferences, imputations of evil motives, or criminal conduct, and attacks upon private character, the publisher being responsible for the truth of what he alleges to be facts. * * * Comment on and criticism of the acts and conduct of public men are privileged if fair and reasonable and made in good faith. But the right to criticize does not embrace the right to make false statements of fact, to attack the private character of a public officer, or to falsely impute to him malfeasance or misconduct in office.'"

In the case of MacDonald v. Sun Printing & Pub. Co., 45 Misc. Rep. (N. Y.) 441, it was said:

"A critic is no more entitled to make false aspersions or misstatements of facts than other persons. Criticism is no exception to the general law of defamation. Criticism is an expression of opinion on facts on which differences of opinion may arise."

In the case of Dowling v. Livingstone (Mich.) 32 L. R. A. 104, it is said:

"Criticism of a book which is placed before the public is not libelous, provided it does not include any misstatements of any material facts contained in the book or attack the character of the author."

The case of Cook v. Pulitzer Pub. Co. (Mo.) 145 S. W. 480, on rehearing, lists the authorities and cites the different rules applying in different states. The court there stated as follows:

"The doctrine is supported by the highest authority that, if facts are stated in the publication upon which the comment

is based, and such facts are false, then the defense of privileged comment fails." Citing a long line of cases.

We think the correct rule may be stated as follows: A public officer may be criticized by the public or the press regarding his official, acts and conduct, on the theory that the public is entitled to know how the officer is discharging his trust, but false charges may not be published. Some of the cases supporting this rule are: Tanner v. Embree (Cal.) 99 Pac. 547; Adams v. Cameron (Cal.) 150 Pac. 1005; Ullrich v. N. Y. Press Co., 50 N. Y. Supp. 788; Belknap v. Ball, supra: Ashford v Evening Star Newspaper Co., 41 App. D. C. 395; Lowe v. News Pub. Co. (Ga. App.) 70 S. E. 607; Starks v. Comer (Ala.) 67 South. 440; Ott v. Murphy (Iowa) 141 N. W. 463; Quin v. Review Pub. Co. (Wash.) 104 Pac. 181; Parsons v. Age Herald Co. (Ala.) 61 South. 345; Pottingall v. Mooers (Me.) 94 Atl. 561, Ann. Cas. 917 D, 689; Cook v. Pulitzer Pub. Co., supra; Moore v. Booth Pub. Co., 216 Mich. 653, 185 N. W. 780; Walters v. Sentinel Co. (Wis.) 169 N. W. 564; Williams v. Hicks Printing Co., 159 Wis. 90, 150 N. W. 183.

The freedom of the press certainly does not depend upon its right to publish false statements that are libelous against an official.

The defendant pleaded the defense of privilege, because it was comment on a matter of public interest. We think the correct rule for the court to follow in this class and character of cases is that announced in the case of Cook v. Pulitzer Pub. Co., supra, wherein the court stated:

"* * * When a defense of privileged comment on a matter of public interest is presented by the issues the plaintiff may overcome the privilege by pleading either by proof that the publication was inspired by actual malice, or the facts published and commented upon were false."

In the case of Democrat Pub. Co. v. Harvey (Ky. App.) 205 S. W. 908, in the body of the opinion it is said:

"In other words, where there is a plea of qualified privilege, the presumption of malice does not arise from the publication itself, but from the falsity of the publication, and the burden of showing its falsity where there is no attack upon the plaintiff's moral character, is upon the plaintiff."

The decisions upon this question are conflicting, but the above rule seems to us to be reasonable and sound in principle.

By applying the rule announced in the above entitled cases, the court erred in advising the jury that the publication was not privileged. The court should have advised the jury that the publication related to a public question and a state institution in which the public generally was interested, that the press had a right to enter into a discussion thereof and a right to criticize the official acts of the parties connected therewith; and have advised the jury that the defendant having entered a plea of privilege, the burden of proof was upon the plaintiff to prove that the statements in the publication which would amount to libel were false and untrue, and if the jury found that those statements were untrue, then the plea of privilege failed, but if they failed to find that the statements were untrue, then they should find for the defendant. We do not think in this class of cases the question of whether the publication was made maliciously is material, except in so far as it related to exemplary damages. The general rule is that the "truth of the communication is a complete defense to a civil action for libel". See Ecuyer v. N. Y. Life Ins. Co. (Wash.) 172 Pac. 359, where the court used this language:

"The truth of the publication is a complete defense to a civil action for libel or slander."

In the case of Ullrich v. N. Y. Press, supra, it was said:

"Our law allows a man to speak the truth although it be done maliciously." Baum v. Clause, 5 Hill, 599.

In other words, if the plaintiff should prove that the article was malicious, but still admit it was true, the publication being a matter of public concern, he would not be entitled to recover under the law of libel and slander.

There are many other assignments of error, but in view of the fact that the case must be reversed, we think it is unnecessary to discuss the same.

For the reasons stated, the judgment of the trial court is reversed, and the cause remanded to the district court to grant the plaintiff in error a new trial.

JOHNSON, C. J., and NICHOLSON, COCHRAN, and MASON, JJ., concur.