## WILEY v. OKLAHOMA PRESS PUBLISHING CO.

No. 13041—Opinion Filed March 18, 1924.

Rehearing Denied Feb. 3, 1925.

1. **Libel and Slander—Allegations of Special Damages—Necessity.**

In an action for libel based upon a newspaper publication, where no special damages are alleged, no cause of action is stated unless the article is libelous per se.

2. **Same—Articles "Libelous Per Se"—Requisites.**

In determining whether the article is libelous per se, the article alone must be construed, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. The article must be defamatory on its face "within the four corners thereof."

3. **Same.**

The article must be construed as an entirety, including the headlines as they may enlarge, explain, or restrict, or be enlarged, explained, or restricted by the context. No

strained, forced, or unnatural, but the most natural and obvious meaning must be given the article in the sense that clearly belongs to the words used. Whether or not it is libelous depends upon the scope, spirit, and motive of the publication taken in its entirety.

### 4. Same—Necessity for Injury to Reputation.

Injury to reputation and not to the feelings of the individual is the subject of redress. The language in the alleged libelous article must be such as to tend to lower plaintiff in the estimation of men whose standard of opinion the court can recognize.

### 5. Same—Words Construed Libelous Per Se.

"You were right. I do not blame you; you did the right thing," are words of commendation and approval; and a newspaper publication of the story of the killing of a 14 year old boy by a policeman while the boy was trying to avoid arrest, which quotes the father of the boy as addressing these words to the policeman who killed the boy, without assigning any reason for the use of such words other than that the boy had been a bad boy and that he could not control him, is libelous per se.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Muskogee County; E. A. Summers, Judge.

Action by Thomas J. Wiley against Oklahoma Press Publishing Company, a corporation, Tams Bixby, E. K. Bixby, and Joel H. Bixby. Judgment for defendants, and plaintiff appeals. Reversed, with directions.

L. C. McNabb, for plaintiff in error.

Joseph C. Stone, Charles A. Moon, and Francis Stewart, for defendants in error.

Opinion by RAY, C. This is a suit for libel based upon a newspaper publication. A general demurrer to the petition was sustained by the district court and the plaintiff, electing to stand upon his petition, judgment was for the defendant from which plaintiff has appealed. The question here to be determined is whether the published article was libelous per se. The following is the published article complained of:

" 'YOU WERE RIGHT,' FATHER TELLS COP WHO SHOT HIS SON. 'I TRIED TO CONTROL HIM BUT IT WAS HOPELESS,' WILEY SAYS, SHAKING HANDS.

"Boy Killed After He Ignored Warning. Policeman Ordered Him to Halt But He Attempted Flight; Pal in Office Building Job is Arrested.

" 'I do not blame you; you did the right thing,' said Attorney Thomas J. Wiley, father of Eugene Wiley, to Plainclothesman Howard Noble, who killed the boy yesterday morning.

"With this comment Wiley gravely shook hands with the policeman.

"The father and the policeman met at the hospital shortly after the boy died. He had lived only a few minutes after he was carried to the hospital in an ambulance from the scene of the shooting in front of the Raymond Building.

" 'I had been afraid Eugene would get in trouble,' said the father brokenly to Chief of Police E. A. Maloney, in the chief's office.

" 'Only last night I warned him to behave himself. I did everything I could for that boy, but I couldn't control him.'

"Shot While Fleeing.

"Chief Maloney made a thorough investigation of the shooting at 5 o'clock yesterday morning when Wiley, who was 14 years old, and Paul Bailey, a youth slightly older, were attempting to escape from the police after they had ransacked several offices in the Raymond Building.

"At the conclusion of his investigation Chief Maloney announced:

" 'It is regrettable young Wiley was killed, but Noble didn't shoot at a boy. He shot at a burglar who turned out to be a boy.

" 'He did absolutely right. When the police go out on burglar calls they expect to encounter desperate men who will shoot first if they get the chance.'

"The chase of the boys followed a call to the police station from Patrolman R. Kelly that two burglars were in the Raymond Building on West Broadway.

"Plainclothesmen Noble, T. W. Watson and Dick Graham responded. Kelly met them and they went to the Wall street entrance to the building.

"The patrolman said he had watched the men enter the building, had waited for them at the foot of the stairs, and when they saw him, they turned and fled back upstairs.

"While Kelly and Graham stood guard at the stairway, Noble and Watson went after the burglars. A search was made by the policemen of several offices. Suddenly Charles Runyan, an attorney who has offices and living quarters in the building. (Continued on Page Four)

(Continued on Page Four)

" 'YOU WERE RIGHT FATHER TELLS COP.'"

'Boy Killed As Burglar After He Ignored Policeman's Warning to Halt.

"(Continued from Page One)

"stepped from his doorway with his revolver drawn.

"Find Other Boy Hiding.

"At first the policemen thought Runyan was one of the burglars but discovering their mistake went through 'Mr. Runyan's quarters toward an inner office.

"As they entered the office they discerned in the darkness, one bandit drop from the window to the electric sign over the clothing store, while another balanced on the window sill, pulling the shade down behind him.

"The officers rushed to the window. Plainclothesman Watson fired at the man who reached the sidewalk, but the boy had dropped under the awning and the bullet missed. The other boy was making his way down the iron support rod of the sign, heedless of the command to halt, and Noble fired.

"Both boys have been in trouble at different times, but on pleas of their relatives, had always managed to go free.

"The funeral of young Wiley will be held at 2 o'clock this afternoon at the First Christian Church, the Rev. J. L. Brandt officiating. A large number of the boy's schoolmates from the Central high school plan to attend. Burial will be in Greenhill cemetery.

"Boy Had No Weapon

"Wiley was unarmed when picked up by the police, but a flash light was found in one of his pockets.

"No weapon was found on Bailey, but he threw a flash light to the lawn as he entered the police station.

"Later when he faced his mother in the office of Chief Maloney young Bailey told her in answer to her question as to what had become of her .25 caliber automatic pistol, that he threw it away at the same time he rid himself of the flash light.

"Police found the flash light, but not the pistol."

Then follows a statement of the confession of Bailey, in which is recounted a number of robberies by him and the boy who was killed, and other robberies committed by Bailey himself, and Bailey's statement that he and Wiley divided the loot equally, but that none of it would be found at Wiley's room for the reason that he always preferred to take his part in cash, and tells of the search of the room of the Bailey boy and the finding of stolen property, of the statement of the county attorney that he was going to prosecute the Bailey boy, and of rumors on the part of the defendants to prove that Bailey was only 15 years old, and of his having been arrested on former occasions but on promise of a reformation had not been prosecuted, and of his apparent defiance of the officers in this instance,

and of his being placed in jail. The article closes with this paragraph:

"Thomas J. Wiley, father of the dead boy, was a candidate for city judge in the last democratic primary election, but was defeated by Charles Wheeler, present city judge."

After a careful consideration of the briefs and the aunthorities cited, we think the proper rules of construction of the article complained of and the petition based thereon, are those contended for by the defendants and agreed to by the plaintiff.

"(a) Unless the article is libelous per se, no cause of action is stated, since no special damages are alleged." Kee v. Armstrong, Byrd & Co., 75 Okla. 84, 182 Pac. 494; N. S. Sherman Machine Co. v. Dun, 28 Okla. 447, 114 Pac. 617; McKenney v. Carpenter, 42 Okla. 410, 141 Pac. 779; Nunnery v. Bailey, 65 Okla. 260, 166 Pac. 82; Phoenix Printing Co. v. Robertson, 80 Okla. 191, 195 Pac. 487.

"(b) In determining whether the article is libelous per se, the article alone must be construed, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. The article must be defamatory on its face 'within the four corners thereof.'" Kee v. Armstrong, Byrd & Co., 75 Okla. 84, 182 Pac. 494; Oklahoma Publishing Co. v. Kendall, 96 Okla. 194, 221 Pac. 762.

"(c) The article must be construed as an entirety, including the headlines as they may enlarge, explain, or restrict, or be enlarged, explained, or restricted by the context. No strained, forced, or unnatural, but the most natural and obvious meaning must be given the article in the sense that clearly belongs to the words used. Whether or not it is libelous depends upon the scope, spirit and motive of the publication taken in its entirety." Kee v. Armstrong, Byrd & Co., 75 Okla. 84, 182 Pac. 494; Marshall v. Chicago Herald, 185 Ill. App. 224; Willfred Coal Co. v. Sapp. 193 Ill. App. 400; Johnson v. Turner (Ala.) 47 South. 570; Furlong v. German-American Press Association (Mo.) 189 S. W. 385; Oklahoma Pub. Co. v. Kendall, 96 Okla. 194, 221 Pac. 762; Phoenix Printing Co. v. Robertson, 80 Okla. 191, 195 Pac. 487.

"(d) Injury to reputation and not to the feelings of the individual is the subject of redress. The language in the alleged libelous article must be such as to tend to lower plaintiff in the estimation of men whose standard of opinion the court can recognize." Phoenix Printing Co. v. Robertson, 80 Okla. 191, 195 Pac. 487; Rossiter v. N. Y. Press, supra; Cohen v. N. Y. Times Co., 138 N. Y. Supp. 206; Oklahoma Pub. Co. v. Kendall, 96 Okla. 194, 221 Pac. 762.

It has been with great difficulty that we have reached a conclusion. After the

most careful consideration of the able and exhaustive briefs and many readings of the article we have reached the conclusion that the article is libelous per se. After having reached that conclusion, and again reading the briefs and the printed article, it now appears clear to us that no other reasonable conclusion can be reached.

The action is based upon the words attributed to the father of the boy and not upon the words which might be considered in defamation of the character of the boy. It is the story of the killing of a 14 year old boy by a policeman. As to the killing, and the incidents leading up to it, it tells that the two boys, at the time supposed to have been men, were discovered up stairs in an office building where they had ransacked several offices. A number of officers were called to accomplish their arrest. When the boys discovered the policemen were after them they atempted to make their escape. The policeman, a plainclothesman, who did the killing went upstairs with another officer and into an inner office from which point he saw one boy drop from the window to the electric sign over the clothing store and fired at him as he reached the sidewalk but missed him. The other boy, son of the plaintiff in error, was first seen balanced on the window sill and pulling the shade down behind him, and was making his way down the iron support rod of the sign, when he was shot and killed. This is the substance of the article in so far as it relates to the boy. The article, as it relates to and makes the father conspicuous, is contained in the headlines and that part of the article immediately following the headlines, commonly known as the feature of a story in newspaper publications. In the headlines, and in the feature portion of the story, the wrong or the offense, if it may be called such, of the policeman, is minimized or justified, and the words attributed to the father are made the feature of the story. "You were right, I do not blame you; you did the right thing," are the words attributed to the father addressed to the policeman who had killed his boy while they were at the hospital where his boy had just died. The words:

"I tried to control him but it was hopeless. I have been afraid Eugene would get in trouble, only last night I warned him to behave himself. I did everything I could for that boy, but I could not control him"

—are the words attributed to the father as being addressed to the chief of police while in that officer's office.

The chief of police is also quoted as saying:

"It is regrettable young Wiley was killed, but Noble did not shoot the boy. He shot at a burglar who turned out to be a boy. He did absolutely right. When the police go out on burglar calls they expect to encounter desperate men who will shoot if they get the chance."

The words attributed to the chief of police are words which thoroughly approve of the act of the policeman in killing the boy, but express regret that the boy was killed. The words of the chief of police, in commending the course of the officer, were accompanied by words which give the reason for the approval of the chief; that it is necessary to shoot before the burglar shoots as they are expected to shoot. The words attributed to the father are not made to appear to be based upon any such reason. The only reason for the father's conclusion that the policeman did right in killing the boy, which can be inferred from the words attributed to him, is that the boy was a bad boy and that he had been unable to control him. The words, "You were right, I do not blame you; you did the right thing" are not words conveying any idea of sorrow or regret. They are words of commendation and approval. The article as a whole shows that the boys were trying to escape and to avoid arrest. The article shows that the boys had committed a burglary but no stolen property was found on them. The only property found on either of the boys was a flashlight. Any person reading the article through would naturally feel that the officer had committed a regrettable blunder in killing the boy while he was climbing down the support of the electric sign to make his escape although the officer may at the time have believed him to be a man who had committed burglary. Then what impression must necessarily be made upon the mind of such reader concerning the father who would, while standing by or near the body of his 14 year old son, say to the policeman, "You were right, I don't blame you. You did the right thing," unaccompanied by words of regret that the boy had been killed? If they had been words which found some excuse upon which the father could have pardoned the unnecessary killing of his boy, it might be thought that he was broad-minded and able to see the case from the policeman's viewpoint. But when he uses words approving the act, and commending the policeman for the killing, the first thought in the mind must be that he was, to put it mildly, an unnatural father. That would be the most charitable view to take. When considered in connection with the other words "I did everything I could for that boy but I couldn't control him, I

tried to control him but it was hopeless." the impression forced upon the mind is that he was relentless and unforgiving even when looking upon the body of his boy shot to death. Who could look upon a father otherwise than with contempt who could use such words in such circumstances? It is not conceivable that the publication of these words attributed to the plaintiff, as the father of the boy who was killed, could have any other effect than to lower him in the estimation of men whose standard the court can recognize.

We think the style, form, and manner of the publication such as to show that the publishers themselves believed the words and actions attributed to the father of the boy would be received by its readers as the most unusual, startling, and sensational part of the story.

In the publication of a newspaper the publishers naturally have in mind the things that will most appeal to their readers. To build up and maintain a great newspaper it is essential for the paper to have a circulation, and that circulation is built up and maintained by the publication of such matter as appeals to the people to be reached by its circulation. It has long been the custom of the publishers of newspapers to head important items with what is called headlines. The headlines are used for the purpose of calling the attention of the reading public to that part of the article most likely to appeal to the public. That part of the work is of such importance that on the large publications men especially skilled in grasping the important or attractive features of the article and condensing them into a few words are employed as headline writers. Following the headlines, that part of the story of most unusual occurrence is featured by being printed in type larger or by leading the type so so as to give it a more prominent appearance and attract the eye of the readers. The language attributed to the father is contained in the headlines and in that part of the article immediately following the headlines generally written as the feature of the story to the exclusion of any reference to the circumstances or manner of the killing. It appears to have been conceived by the publishers that the commendation by a father of the act of a policeman in killing his son was more startling, more unusual, than the killing by a policeman of a 14 year old boy while climbing down the support pole of an electric sign to avoid arrest. The form and manner of the publication was such as to force upon the attention of that class of readers who do not read detailed stories of murders the statement of a father that he commended the act of the policeman in killing his hon.

We think, considering the scope, spirit, and motive of the publication, taken in its entirety, and giving the article its most natural and obvious meaning in the sense that clearly belongs to the words used, the article is defamatory on its face "within the four corners thereof" and could have no other effect than to lower the plaintiff in the estimation of men whose standards the court can recognize.

For the reasons given we think the judgment should be reversed with directions to vacate the judgment and proceed in accordance with the views expressed in this opinion.

By the Court: It is so ordered.