Note.—See under (1) 4 C. J. p. 801, 31 Cyc. p. 646; (2) 33 Cyc. pp. 1369, 1382; (3) 23 C. J. p. 49; (4) 33 Cyc pp. 1371, 1373; (5) 33 Cyc pp. 1371, 1372; (6) 33 Cyc pp. 1382, 1383, 1384; (7) 33 Cyc p. 1327, 12 C. J. p. 1245: (8) 22 C. J. pp. 922, 915, (1926 Anno); (9) 18 C. J. p. 739 (1926 Anno); (10) 4 C. J. p. 814; 40 Cyc p. 2243; (11) 40 Cyc p. 2242 (1926 Anno); (12) 22 C. J. p. 467; (13) 2 C. J. pp. 935, 945, 961; (14) 22 C. J. p. 321; (15) 22 C. J. p. 199; (16) 22 C. J. p. 420 (1926 Anno); (17) 38 Cyc p. 1756; (18) 4 C. J. p. 1029; (19) 33 Cyc p. 1398: (20) 38 Cyc p. 1486; (21) 26 C. J. p. 466; 33 Cyc p. 1350; (22) 4 C. J. p. 1168.

---

## DUSABEK et al. v. MARTZ.

No. 15181—Opinion Filed May 4, 1926.

Rehearing Denied Sept. 7, 1926.

(Syllabus.)

**1. Libel and Slander—Language Libelous Per Se.**

Language used in a newspaper article which, when given its ordinary, natural, and obvious meaning, exposes the person concerning whom it is used to public hatred, contempt, ridicule, or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation, is libelous per se and actionable.

**2. Same—Publication Derogatory to Ex-Soldier.**

A publication that charges, in substance, a United State ex-soldier of the World War with being unpatriotic; with shirking his duty to his country in failing to enlist for service until forced by the Draft Act, and with doing everything possible to evade service, and specially charging that he married in order to secure exemption from service, but failed in his purpose and had to go, and charging him with being an active officer of the American Legion for pecuniary gain, is libelous per se.

**3. Same—Insufficiency of Defense—Case Overruled.**

It is not a sufficient answer to a charge of libel to show that the publication only accuses plaintiff of having done that which he might legally have done, the rule being that it is not libelous to charge a person of having done that which he might legally and properly have done. The rule of this

court, announced in Kee v. Armstrong, Byrd & Co., 75 Okla. 84, 182 Pac. 494, to the effect that "words charging one with being engaged in a perfectly lawful transaction, or merely doing that which he has a legal right to do, are not actionable per se," is overruled.

Error from District Court, Blaine County; Thomas A. Edwards, Judge.

Action by Andrew C. Martz against George F. Dusabek and T. J. Lewis, for damages for libel. Judgment for plaintiff, and defendants appeal. Affirmed.

I. H. Lookabaugh and Horton & Horton, for plaintiffs in error.

Seymour Foose, R. C. Brown, W. R. Bleakmore, and John Barry, for defendant in error.

RILEY, J. Defendant in error, as plaintiff below, obtained judgment in the trial court for libel against the plaintiffs in error, as defendants below, from which judgment this appeal is prosecuted. For convenience the parties will be referred to herein as they appeared in the trial court.

The only material questions presented in this appeal are whether or not the article complained of in plaintiff's petition was libelous per se, and whether or not it was necessary for the plaintiff to prove actual damages in order to sustain the recovery.

The plaintiff was the editor and owner of the Okeene Record and the defendants edited and owned the Okeene Leader, both being weekly newspapers published in Okeene, Okla. The article complained of, which was admitted and shows upon its face to have been published of and concerning the plaintiff, is as follows:

"In Answer: The Okeene Record, the 'germ of literature and logic,' last week in attempting to make a reply in defense of the American Legion, of which he boasts he is a member (however, by the act of compulsory army service only), takes a direct slap at the editor of the Leader.

"He tells the folks through the columns of his paper that he is a member of the American Legion and proud of it and a little further down states that the editor and owner of the Leader are about the same age as he, intimating that the editor of this paper should have been in Uncle Sam's service during the World War.

"The first thing we wish to call your attention to, Mr. Martz, is the fact that had Uncle Sam come and demanded our services, such as he did yours, we too could have boasted of a few months' service in a training camp, far away from the sound of the enemy's guns.

"Secondly. the editor of the Leader made no attempt to keep out of the service. Long before the draft bill was passed we conversed with an army recruiting officer at Fairview. He was very frank in his assertions and in practically these words said: 'I have no d— time to take up with men who have families. we are after a bunch of these yellow-backed single guys, who should be here now volunteering.'

"Later on, Martz, the draft bill was passed. In that bill was a proviso that married men wou'd be the last called to the colors. It caused the marriage license clerk to work overtime, the ministers were doing a land office business. But you remember it was discovered that the men who were married after the declaration of war would be called the same as a single man, thus causing many to leave their war brides and enter into the service with their more patriotic companions.

"The editor of the Leader was not guilty of any of these acts. We were married several years before the opening of the World War. Our boy was quite a lad when the draft law came into effect, hence, not like some others, we were not hiding behind the folds of a woman's garments. We made answer to our questionnaire the same as you, all that was required of any American citizen.

"We made no attempt to evade the draft and had it been our lot to be called would have done our bit, expecting nothing in return. When we came back we would have also considered one comrade as good as another, whether he was rich or poor, the same feeling would have existed here as did in the front line trenches. for we are not much on 'society lines' as we have never yet found a man so low that we would not clasp his hand in friendship, nor a man so high up in this life that we considered him better than we were

"There should be a little distinction, however, between the boys who fought 'over there' and the ones who just entered a training camp. To our opinion the man who served best should be given preference in the selection of your officers for the American Legion post. The Okeene post, we believe, would have made a better showing had such men as Floyd Fullbright, Ira Towns, John Adams, Bill Marcoux and others, who faced the enemy over there— really did some fighting and who did no' belong to the commissary department or the mule drivers' brigade.

"You speak of being engaged in a more necessary occupation. We were both, practically speaking, in the same line of industry—both printers. The Leader editor managing a newspaper, while you were in the mechanical department of a newspaper. Did you attempt to volunteer? Was there any-

thing at any time to prevent you from offering your services? Is it not a fact that your constant aim was to some way. somehow, to get by, and that you were among those who stayed out of the game as long as possible?

"We respect the uniform you wore. you are worthy of some consideration for wearing it, but when it comes down to real patriotism, real Americanism. we consider we will stand the acid test along with some of those whom Uncle Sam said 'Come, I want you,' and would have never served under any other consideration.

"Yes, Mr. Editor of the Okeene Record, you should be proud of your membership in the American Legion Post, to the extent of $15 per month during trades day season. That ought to swell you up with pride."

"Sure enough Curtis Evans may not be a member of the Okeene Post American Legion and if we are rightly informed there are many overseas men here who are not members of the Okeene post. because of the narrow-mindedness of the ruling members of this post. Even if he is not a member of any post he is. by reason of his service, entitled to at least human care and human interest. even if a social line has to be drawn and Evans was never shot in the foot.

"The owner of the Leader called on Curtis Evans and was there informed that no member of the Okeene post except Patkowski had been there as such. That the Record man had been there presumably for news, and that Evans was asleep and was not disturbed. The Record man was able to acquire and publish an ugly story of Evans' condition prior to his being found in the well."

The plaintiff pleaded this publication: that it was false, malicious, unprivileged, libelous, and exposed the plaintiff to public hatred, contempt, ridicule, and obloquy, and tended to deprive him of public confidence and injure him in his occupation as publisher of his paper and to injure him in his good name and reputation; that the same caused him great mental suffering and injured and wounded his feelings, all to his damage in the sum of $10,000 for which he prays judgment.

Defendants demurred to the petition on the ground that it did not state a cause of action. The demurrer was overruled by the court, and the defendants make this their first assignment of error. They contend that the publication was not libelous per se; that is, within itself, on its face. according to the meaning of the words; and no actual damages being alleged, the petition was not sufficient to state a cause of action. They contend that the language used in the

article only charged plaintiff with doing what he had a legal right to do.

As to whether the article is libelous per se, we must consider in our determination only the thought, idea, impression, or opinion conveyed to the reader by the publication, everything appearing in the article, be it inference, insinuation, irony, ridicule, sarcasm, the friendly or unfriendly tone, its arrangement, form, and style. The court for such purpose becomes the lay person to whom it is addressed, and in arriving at the meaning everything appearing in or from the article which, unaided by extrinsic facts or circumstances, has a natural tendency to change, color, or formulate its meaning must be considered. Conversely, if the aid of innuendo is necessary to make the meaning defamatory, it is not libelous per se. Innuendo, as here used, is strictly in its legal application as an averment of the meaning of alleged libelous words. Johnston v. Morrison (Ariz.) 21 Pac. 465.

If the article, when so considered, engenders in the mind of the reader a conclusion, impression, or opinion of the plaintiff that is defamatory, and as such tends to expose plaintiff to public hatred, contempt, obloquy, or tends to deprive him of public confidence or lower him in the opinion of men whose standard of opinion the court can properly recognize, or tends to induce them to entertain an ill opinion of him, it is libelous per se. See Bratcher v. Gernert et al., 77 Okla. 12, 185 Pac. 1081; Phoenix Printing Co. v. Robertson, 80 Okla. 191, 195 Pac. 487; Wiley v. Oklahoma Press Publishing Co., 106 Okla. 52, 233 Pac. 224; Stevens v. Snow (Cal.) 214 Pac. 968; Choctaw Coal & Mining Co. v. Lillick (Ala.) 86 South. 383; Jones et al. v. Greeley (Fla.) 6 South. 488; Stewart v. Pierce (Iowa) 61 N. W. 388; Finch v. Vifquain (Neb.) 9 N. W. 43. The publication cannot be measured by its effect when subjected to the critical analysis of a trained legal mind; it must be measured by its natural and probable effect upon the mind of the average lay reader. Stevens v. Snow, supra. The fact that the thought conveyed is by way of insinuation or inference of false acts or facts is immaterial, for to say that one may injure another through insinuation or inference without being held accountable is to license the assassin of good names to do more effectively indirectly without risk that which he could do directly.

It is settled in this state that the intent or motive of the defendant in a libel case is immaterial, except where punitive damages are sought. Harris v. Rich, 104 Okla.

120, 229 Pac. 1080. A man's good name and reputation is his most valuable personal and property right and one that no man may wrongfully injure or destroy without being held accountable therefor.

It is contended by defendants that the article is merely couched in language intended to wound the feelings of plaintiff, and that it merely charged him with having failed to volunteer in the recent war, with waiting to be inducted into service under the Selective Service Act, and that he never came in contact with the enemy. If that were true, it could not be considered libelous per se, because those who served under the Selective Service Act served honorably and well and are properly accorded by every good citizen the highest esteem and respect. As for those who failed to meet the enemy, it was no fault of theirs. They were willing and true patriots. However ill it becomes those who did not serve their country in uniform to cast aspersions upon those who did, and thereby attempt to lessen the gratitude and respect of the public for honorable and faithful service rendered, we agree that such is not libelous per se.

Such, however, was not the thought or the meaning conveyed by the article. The purpose of written words is to convey the thought of the author. The tone of written words is subject to as many variations as the tone of spoken words. The use of a given word or phrase often makes the stroke that of the feather adorning the reputation of a man; the use of another may make the stroke that of a hammer, destroying the reputation of a man. Words quite innocuous on their face may, by reason of their peculiar setting and relation with other words, be cruel, slanderous, and vicious. The article here unmistakably portrays the tone and the mental viewpoint of the author to be unfriendly and contemptuous of the plaintiff. The author compares his record as a private citizen during the war with the military record of plaintiff. Every statement, fact, inference, and insinuation in the article refers to the author or to the plaintiff. The plaintiff is repeatedly charged with deliberately avoiding war service as long as was humanly possible. It states the author did not volunteer because a recruiting officer advised him that married men were not wanted, but that it was "those yellow-back single guys that were wanted," clearly referring and applying such epithet to the plaintiff. It states that many desperately sought to evade the draft and heartlessly entered into hasty and convenient marriages to aid them therein, but that such avenue

of escape was in vain. The author, it boastingly says, was guilty of none of these things. He did not hide behind the folds of a woman's garment. It states that the plaintiff, in spite of all, finally had to go, but that after going he purposely managed to get into the Commissary Department to insure his personal safety. The article makes the pointed inquiry:

"Is it not a fact that your constant aim was to someway, somehow, to get by, and that you were among those who stayed out of the game as long as possible?"

The publication concludes by cha·ging that plaintiff belonged to the American Legion for the selfish purpose of making $15 per month out of it, and that he ought for that to be swelled with pride. This last, we think rather, a sordid, hypocritical, sarcastic insinuation that was intended to picture the plaintiff as an arch hypocrite at the head of a patriotic organization. This thought is made more clear by the reference that deserving members of the post who had actual service should be placed at the head of the post instead of the plaintiff. The article naturally conveyed these thoughts and was intended to, and did, have the effect to expose plaintiff to public hatred, contempt, scorn, and shame, to deprive him of public confidence and lower him in the estimation of men.

We pass the facts proven by the record wherein it is shown that plaintiff volunteered five months before the draft, that he did not marry until after the war, that he served honorably in a combat division, and was sincere in his membership in the patriotic organization, the American Legion, for such facts only go to show the vicious depravity that prompted the attack, and could be considered only in determining the amount of damages.

The charge of being a groom to a "war bride" for the purposes of a "slacke·" is to say that he designedly prostituted the most sacred relation known to man; that, failing in the true object of his matrimonial venture, he sought and secured a sinecure in a noncombat arm of the service. The reader is forced to conclude that plaintiff is not only without chivalry toward women, but a panicky, fear-stricken, skulking, unprincipled coward, devoid of honor and principle and without feeling or courage for his country's sake. Finally, it is charged that, having escaped with his contemptible body and soul, he is an arch hypocrite, a posing sunshine patriot, and is using the honor and privilege of being the head of the ex-service

men's patriotic organization for mercenary purposes. Such being the thought conveyed to us by the article, we say the same tended to lower the plaintiff in the estimation of all honorable men and women.

This court, in the case of Bratcher v. Gernert et al., 77 Okla. 12, 185 Pac. 1081, held a publication to be libelous that accused one of trying to interfere and prevent the success of a county fair, couched in such terms as to picture the plaintiff as being a man devoid of public spirit. The court in discussing the article said:

"Without extended comment, we deem it sufficient to say that it conclusively appears from the words used that the gist of the article is: That the plaintiff is not a public spirited citizen; that he is seeking to take advantage of and to profit by the industry and public enterprise of other citizens of his community; and that he is unworthy of confidence and should not be patronized by the public. These accusations, in our opinion, expose him to public hatred and contempt, and certainly tend to deprive him of public confidence, and to injure him in his occupation."

The article complained of herein far more bitterly makes the same charge, and, in addition, charged the plaintiff with being devoid of every patriotic impulse, and with using his undeserved standing and office in the American Legion for selfish, mercenary purposes.

In the case of Choctaw Coal & Mining Co. v. Lillich (Ala.) 86 South. 383, the use of the word "slacker" was held to be libelous per se.

It is generally held that a publication imputing cowardice is libelous per se. 36 C. J. 1167; Price v. Whitley, 50 Mo. 439; Byrne v. Funk, 38 Wash. 506, 80 Pac. 772.

The courts have frequently held that to charge one with being a hypocrite is libelous per se. 36 C. J. 1170. The leading case is Jones et al. v. Greeley (Fla.) 6 South. 448, wherein the court said:

"This court has held that to publish of and concerning any person any language which tends to bring him into ill repute, or to destroy the confidence of his neighbors in his integrity, is actionable per se. Montgomery v. Knox, 23 Fla. 595, 3 So. Rep. 211. It is too apparent to require comment, that the language complained of was calculated to produce just such injury to appellee. It in effect brands him as a hypocrite, and as one who, under the cloak of hypocrisy, oppresses the widow and orphan. What worse could be said of him short of imputing high crime? To be published as a hypocrite the authorities hold is actionable (Townsh. Sland. &

Lib., section 177; Thorley v. Kerry, 4 Taunt. 355; Maloney v. Bartley, 3 Camp. 213); and when to that is added the stigma of such greed as impels him to inflict untold sorrow upon the most helpless members of the community, the case becomes one of much stronger actionable character."

In Finch v. Vifquain (Neb.) 9 N. W. 43, it was said:

"This charge is that plaintiff 'was an arch hypocrite and scoundrel, who was simply using his talents for money-making purposes, and not through any sincerity in the cause in which he was laboring.' This charge must have been intended by the publishers to degrade the plaintiff in the estimation of the community, and deprive him of that influence and temporal advantage which usually results from a sincere and blameless course of life."

It has been held to be libelous per se to charge one with being unfaithful to his employment (Burghart v. Scioto Sign Co. [Iowa] 179 N. W. 77), or with abusing the confidence of a friend and thereby taking advantage of him (Stewart v. Pierce [Iowa] 61 N. W. 388). See, also, Eckert v. Von Pelt (Kan.) 76 Pac. 909.

No one may doubt the loathing contempt the author held for Martz, and through his article he gave vent to his spleen, expressing himself in defamatory, scurrilous terms.

This government, through its courts, owes its patriotic sons a duty to protect them from such slandering, traducing defamers, who would by their cynical lies, destroy patriotism, and take that from a man which neither he nor the courts could return—honor and reputation. We feel that a court would be recreant in its governmental duty not to stay the hand of one who would so crucify patriotism.

The plaintiff has come into court seeking redress for an attack that could have been the moving cause of a tragedy; for this he is to be commended. He has pursued the orderly way to settle individual wrongs as well as the adopted manner of settling wrongs between his country and others. His injury is in a measure the injury of the public; it should be redressed, and those who villify the honorable service record of a soldier should be warned that they do so at their peril.

It is next insisted by the defendants that the verdict may not be sustained because there was no proof of actual damages.

A publication that is libelous per se both under the common law and under the provisions of our statutes does not require that special damages be pleaded or proven. Kelly

v. Roetzel, 64 Okla. 36, 165 Pac. 1150; Gundram v. Daily News Publ. Co (Iowa) 156 N. W. 840. The plaintiff is not required to make proof of damages in such instance. See, also, Jimeno v. Commonwealth Home Builders (Cal.) 191 Pac. 64.

Counsel for defendants herein next urge that the article cannot be held to be libelous per se, because it did not charge the plaintiff with doing anything other than he might legally do. With this contention we are unable to agree.

In the fourth paragraph of the syllabus in the case of Kee v. Armstrong, Byrd &. Co., 75 Okla. 84, 182 Pac. 494, this court said:

"Words charging one with being engaged in a perfectly lawful transaction, or merely doing that which he has a legal right to do, are not actionable per se."

An examination of that case discloses that such pronouncement was dictum. We approve the conclusion reached in that case, but cannot accept the rule above quoted.

It is only necessary to refer to a few of the numerous cases wherein it has been repeatedly held that publications exposing one to public hatred, contempt, ridicule, or obloquy are libelous per se where the acts charged were not illegal to show such rule to be unsound. See Bratcher v. Gernert et al., supra; Spencer v. Minnick, 41 Okla. 613, 139 Pac. 130; Wiley v. Okla. Press Pub. Co., 106 Okla. 52, 233 Pac. 224. In the Wiley Case, supra, an article stating that a father condoned the act of an officer in shooting his son when in the act of committing a felony, was held to be libelous per se, because it pictured the father as being heartless and unnatural. Such a contention flies in the face of every accepted definition of libel. The true rule is that where the publication charges the plaintiff with nothing that he might not have legally and properly done, the same cannot be held to be libelous per se.

In the case of Bennett v. Commercial Advertisers Ass'n., 129 N. E. 343, the Court of Appeals of New York, in discussing a publication which charged a Congressman with putting a joker in a bill, answered the contention urged by counsel for the defendants as follows:

"The libel law has never been confined to charges of illegality or lawbreaking. Any false accusation which dishonors or discredits a man in the estimate of the public or his friends and acquaintances or has a reasonable tendency so to do is libelous. In Triggs v. Sun Printing & Pub. Co., 179 N. Y. 144, 71 N. E. 739, 66 L. R. A. 612, 103 Am. St.

Rep. 841, 1 Ann. Cas. 326, a libel was stated to be a written or printed statement or article, published of or concerning another, which is false and tends to injure his reputation and thereby expose him to public natred, contempt, scorn, obloquy, or shame."

The same contention was made in the case of Stevens v. Snow, 214 Pac. 968, and the Supreme Court of California said:

"Appellants complain that the trial court erred in instructing the jury that the publication was libelous per se, and they invoked the rule that 'it is never libelous to accuse a person of having done that which he may legally and properly do.' The validity of this rule may be conceded, but in its application the words 'and properly' must not be ignored. It is not sufficient answer to a charge of libel to show that the publication only accuses the plaintiff of having done that which he may legally do. It has never been the law that a publication, to be libelous, must accuse a person of having committed a crime or otherwise violated some law."

In so far as the case of Kee v. Armstrong, Byrd & Co., supra, holds that to charge one with doing nothing more than he might lawfully have done is not libelous per se, the same is overruled.

The judgment of the trial court is affirmed.

BRANSON, V. C. J., and HARRISON, MASON, LESTER, HUNT, and CLARK, JJ., concur. NICHOLSON, C. J., absent, not participating.

Note.—See under (1) 36 C. J. p. 1163 §28; 17 R. C. L. p. 286; 3 R. C. L. Supp. p. 644; 4 R. C. L. Supp. p. 1115; 5 R. C. L. Supp. p. 937. (2) 36 C. J. p. 1167 §34: p. 1170 §42: anno. 11 A. L. R. 1014; 17 R. C. L. p. 268; 4 R. C. L. Supp. p. 1115. (3) 36 C. J. p. 1164 §28.