246 P.2d 206

**DEL RICO CO. v. NEW MEXICAN, Inc., et al.**

No. 5364.

Supreme Court of New Mexico.

June 28, 1952.

Rehearing Denied Aug. 4, 1952.

Harry L. Bigbee and Donnan Stephenson, Santa Fe, for appellant.

Seth and Montgomery, Santa Fe, for appellees.

SADLER, Justice.

The plaintiff as appellant seeks a review of the judgment of the district court of Santa Fe County dismissing its complaint under which damages were sought against the defendants for alleged libels said to have been published concerning plaintiff

and the milk sold at the dairy operated by it. As originally filed Norman Shenk and Genevieve F. Shenk, who own substantially all the stock of plaintiff corporation, appeared as co-plaintiffs but they were dismissed out upon motion from which they prosecute no appeal. Likewise and upon his motion, Dr. S. W. Wiest, City Milk Inspector, was dismissed as a defendant. It is because the trial court also sustained a motion to dismiss the plaintiff's complaint as later disclosed that the plaintiff, feeling aggrieved, has prosecuted this appeal from the judgment against it.

The complaint was in two counts, each alleging a separate publication. The first one appeared on December 2, 1946, in Santa Fe New Mexican, a daily newspaper then published by defendant, Santa Fe Publishing Co., controlled through stock ownership by defendant, Frank C. Rand, Jr., but now by the defendant, The New Mexican, Inc., its successor. It read:

"Schedule Milk Hearing Today For 2 Dairies

"The sanitation committee. of the city council was to hold a hearing at 4:30 P. M. today at the office of Dr. Horry Payne, district health officer, at the request of Shenk's and Brunk's dairys.

"Dr. S. W. Wiest, city milk inspector, recently reported to the council the two were selling milk from sources not approved by ordinance. At the same time he approved Slade's dairy milk. The inspector added that the two wanted a hearing to see if some means cannot be devised for them to sell their milk under the present ordinance. .

"Dr. Albert S. Lathrop is chairman of the committee, the other members being Dr. Jose Maldonado and Frank S. Ortiz. Representatives of the state health department also were expected to attend."

The second count complains of another publication in said newspaper in its issue of December 3, 1946, reading as follows:

"Officials Find No Remedy For Milk Problem

"Watta headache for old Santa Fe and from milk at that.

"Should distributors be allowed to continue to label Grade 'C' milk as Grade 'A'? Or should the city insist on strict compliance with the milk ordinance and risk a shortage?

"Dr. Albert S. Lathrop, chairman of the city council's sanitation committee, put the questions before a meeting of a score or more of distributors and producers, city, district and state health authorities late Monday afternoon at the county courthouse. At the end of two hours, he stated he had not found a satisfactory answer.

"Santa Fe has been getting milk from both approved and unapproved dairies, the physician said. Some of the latter, he added, are in Colorado which does not require the Bang's test. In the war years, to avert a milk famine, the city eased up on its standards, permitting the Grade 'A' labeling of the pasteurized product of all sources. This condition still prevails.

" 'The public had no way of telling what kind of milk it is getting,' said Doctor Lathrop. 'There should be some means of differentiating between the grades, by the price or in some other way. It may be that the thing to do is to cut off unapproved milk and face a shortage. As yet I don't know what to do. I wanted help on this particular problem—that's the purpose of this meeting—and I'm not getting it.'

"Shenk Estimates Shortage.

"Norman Shenk estimated the shortage would be 4000 quarts daily. 'Grade "C" labels are not obtainable at this time,' Shenk said. He thought they might be available in six to eight months.

"Dr. James R. Scott, state health officer, said his department's only interest in the local situation was to see the milk labelled correctly. The barriers had been down for several years. There had to be an end to this some-time—just when was the city's problem.

"Shenk, putting himself on record for improving the supply, suggested setting a deadline, for strict enforcement, say next Sept. 1. His distributing plant didn't require it, he said, but he believed the producers should be allowed a reasonable time to put their dairies in shape. Just now, he added, they were not making money; they were dependent upon the grass in the summer to tide them over.

"Shenk suggested revision of the ordinance to bring it 'up to date and into conformity with U.S. public health service standards.' That, Lathrop said, was a matter of future policy; had no relevancy to the current problem. The Shenk program calls for a $3000 full-time city milk inspector with a $75 monthly mileage allowance. He would be non-political, accountable jointly to the city council and to the district health officer.

"An Appeal Board

"There should be an appeal board consisting of the district health officer, state milk sanitarian and medical doctor, preferably an alderman. Any producer or distributor would have the right of appeal from inspector's decisions.

542

"Any violators would have two weeks within which to correct conditions condemned by the inspector.

"Under Shenk's set-up, the district and state milk sanitarians and the USPHS specialists would act merely in an advisory capacity to check the inspector's work.

"At the opening of the meeting, Shenk and Curtis Williams (Brunk's) kicked the old milkpail around a bit. They felt an injustice has been done them and they had been libeled in Dr. S. W. Wiest's recently-published report as city milk inspector. The report approved Slade's dairy; but said that Shenk's and Brunk's should not be allowed to use the Grade 'A' label 'if they continue to bring in milk that is not approved by the city ordinance.'

"The report, Shenk said, might lead people to believe 'We're just a couple of so-and-sos. He thought his plant and Brunk's were entitled to a 'public retraction.'

"Shenk favored the appointment of a committee to go over the records in the district health office 'to see just who the Grade "A" producers and distributors are.' That didn't come within his authority, Lathrop said.

" 'I think it is unfair to say that anybody had Grade "A" milk unless the records prove it,' Shenk said. He

doubted if all of Slade's producers were Grade 'A'.

"Dr. Lathrop picked up William's charge that the district health officer, Dr. Horry Payne, had not authorized the Wiest report.

"Doctor Payne had declared himself in perfect accord with his findings, said Wiest, when Lathrop queried him. Unruffled Wiest sat smoking a big pipe.

"Dr. Lathrop then turned to Payne. 'Yeh,' said Payne. District Sanitarian Willie Cortez said, to his knowledge, Slade's had cut off all unapproved dairies. Dumas Slade added that every one of Slade's producers had a permit to use Grade 'A'.

" 'My idea about all of this sort of thing is to keep it out of the paper,' remarked Williams. 'When it comes out in the paper it sets the health program back 10 years.' 'When it is not true, it does,' he added when Lathrop disagreed.

"Dr. Lathrop believed those who were selling 'A' milk entitled to the credit, but that those who did not should not be permitted to use the 'A' label.

"Shenk protested the fairness of allowing a man to put 'A' on his milk, 'because he pays the producers more.'

" 'That isn't the point,' said Lathrop, expressing regret at the 'personal feeling' shown at the meeting.

"Cortez was against the importation of Kansas and Colorado milk, from outside his zone of inspection. It was inspected by the federal authorities before it crossed the state line, said Shenk, adding, however, their tests were not as strict as the city's. He regarded it as safe.

"There was no reason why Grade C milk should not be sold if it were so labeled, Lathrop said.

"Slade stated the Santa Fe milk shed as good as any in the state, better than some."

After publication on December 2, 1946, in Santa Fe New Mexican of the article set out in Count one of the complaint, entitled "Schedule Milk Hearing for 2 Dairies", the plaintiff alleged by innuendo in paragraph 8 of the first Count of its complaint, as follows:

"By publication of the foregoing article the defendants, The New Mexico Publishing Company and Frank C. Rand, Jr., conveyed and said article was understood by the persons reading it to have, one or more of the following meanings:

"(1) That Slade's milk was Grade 'A' and that the milk of the plaintiff was not.

"(2) That Slade's milk was of better quality than that of the plaintiffs.

"(3) That Slade's milk was more pure than that of the plaintiffs.

"(4) That the milk of the plaintiffs was impure and possibly harmful to those consuming it."

In the same fashion, after setting forth verbatim in Count two of its complaint the article published on December 3, the day following the first publication, entitled "Officials Find No Remedy For Milk Problem", the plaintiff made exactly the same allegations by way of innuendo in paragraph 3 of the Second count of its complaint touching this publication as it had made in Count one (copied next above) about the first publication.

As indicated by a reading, the first publication was an ordinary news item concerning a meeting to be held at 4:30 that afternoon by the Sanitation Committee of the City Council at the office of Dr. Horry Payne, District Health Officer, at the request of Shenk's (plaintiff) and Brunk's dairies. Apparently, as the article reflects, Dr. S. W. Wiest, City Milk Inspector, had recently reported to the Council that the two dairies named were selling milk from sources not approved by ordinance and according to the inspector they wanted a hearing to see if some means could not be devised whereby they could sell their milk under the existing ordinance. Dr. Albert

S. Lathrop, a councilman, was mentioned as Chairman of the committee, the other members being councilmen Dr. Jose Maldonado and Frank S. Ortiz, who was mayor at the time.

The second article of December 3 was a report of the meeting mentioned in the first article and is of considerably greater length than the short news item announcing the meeting published the day before. Both publications dealt with the report of Dr. Wiest, City Milk Inspector, to the Sanitation Committee of the City Council concerning the situation existing in Santa Fe from a milk shortage and the fact that during the war by reason thereof the city had eased up on its standards of milk production and labeling.

As stated above the plaintiffs Norman Shenk and Genevieve F. Shenk, his wife, were dismissed out of the case upon the ground that their ownership of substantially all the stock of plaintiff gave them no standing to sue for damages, if any, to it; in other words, that they were not real parties in interest. Likewise, and also as indicated above, City Milk Inspector, Dr. S. W. Wiest, was dismissed out upon his motion setting forth grounds, among others, (a) that the statements attributed to him were not actionable; (b) that no special damages were alleged from any act of his; (c) that it appeared on the face of said article that the statements attributed to him, if otherwise actionable, were made under such circumstances as to be privileged. There was no appeal by any party to the action from the orders dismissing the Shenks as co-plaintiffs and Dr. Wiest as a defendant.

The defendants, The New Mexican, Inc., a corporation, The New Mexico Publishing Co., a corporation, and Frank C. Rand, Jr., filed a pleading containing three separate motions (1) one entitled a motion for more definite statement or bill of particulars; (2) Motion to strike; and (3) motion to dismiss. The first motion pointed out that there were matters alleged generally in paragraph 9 of the first cause of action and in paragraph 4 of the second cause of action claimed to be false, yet which were well known to be true and correct and that defendants were entitled to know what portions of said articles the plaintiff would contend at the trial were false. The motion to strike relates to matters not here important to enumerate. The motion to dismiss, among other grounds, set forth (1) that the publications were not libelous per se and that no special damages were alleged; (2) that the publications showed on their face they were neither libelous per se nor per quod; and (3) a claim of privilege, as follows:

"(c) That said publications are privileged in that they, and each of them, are reports of public hearing held by duly elected officials of the City of Santa Fe, New Mexico, a municipal

corporation, upon matters of public community health, welfare and concern, and there is no allegation in said Complaint that said publications are not accurate, complete, or a fair abridgement of such proceedings."

The motion of defendants to make more definite was sustained as was the motion to strike. The last mentioned motion as hereinabove indicated is not now important nor, as for that matter, is the one to make more definite although defendants insisted below that it was never fully complied with. The defendants' motion to dismiss, after argument of counsel, was sustained, the court declaring therein that the articles were neither libelous per se nor per quod and that the motion was well taken. The cause was dismissed and this appeal results.

The report that was before the meeting and the subject of discussion was that of an original defendant, later dismissed from the case as already noted, Dr. S. W. Wiest, City Milk Inspector. His report was made at the request of the City Council and the meeting was held at the instance of the plaintiff and another dairy anxious to ascertain if they could continue selling their milk under the existing ordinance as they did during the war. It seems that certain dairies had become able to comply with the ordinance while certain others were not in a position to do so. Hence, the latter were seeking some means whereby they might continue operations under existing practices until they could comply.

It was in such circumstances that the two publications were made. The plaintiff makes no claim that the articles did not fairly and accurately deal with the Wiest report and likewise the proceedings at the meeting mentioned. It must be assumed, then, that the publications gave an accurate summary of Dr. Wiest's report and what occurred at the meeting. Certainly it was a matter of public health and interest to the many families in Santa Fe and surrounding areas to know what action was being taken by the Sanitation Committee of the City of Santa Fe at their meetings. Only a small fraction of the population of Santa Fe would be able to attend meetings of this kind personally. Consequently, it was but natural that they should look to the press for information concerning them.

A reading and study of the publications satisfies us that neither is libelous per se measured by the criteria we have approved for testing the character of a writing as such. It requires the innuendo supplied for each article by the pleader to give it the single meaning claimed, namely, that (1) Slade's milk was Grade "A" and that of the plaintiff was not; (2) that Slade's milk was of better quality than that of the plaintiff; (3) that Slade's milk was more pure than that of the plaintiff; (4) that the milk

of the plaintiff was impure and possibly harmful to those consuming it. Without the innuendos with which the pleader follows each article, no such meaning as they supply proclaims itself from the face of either publication, or is necessarily to be implied therefrom.

■ Let us look at the language of the first article. On its face, as already indicated, it would appear to the reader as an ordinary and harmless news item about a matter of top concern to the people of any community, their milk supply. Incidentally, the article does not so much as mention Grade "A" milk, as charged in the innuendo relating to it. It mentions an ordinance but does not state its terms. Although it refers to a report of Dr. S. W. Wiest, City Milk Inspector, to the council that plaintiff and one other dairy were selling milk from sources not approved by the ordinance, that statement is followed almost immediately by reciting the request of the two dairies mentioned for a hearing, presumably before the Sanitation Committee, to get approval for sale of their milk under the existing ordinance, thereby indicating confidence on their part they could secure approval and supporting the implication, at least, that their sources of supply could meet the conditions of the ordinance, whatever they were. Certainly, any imputation from what is said that the milk of the two dairies mentioned was unsanitary, unwholesome or otherwise not health-

ful would have to be read into it as plaintiff seeks to do by his innuendos. Such a meaning neither arises on the face of the language employed nor does it force such an implication. The plaintiff evidently did not think so when he indicated the need of an innuendo by supplying one. The trial court did not err in reaching the same conclusion. So much for publication No. 1. It is not libelous per se.

■ Turning now to the second publication, we reach the same conclusion touching it as did the trial court in this particular, viz., that it is not libelous per se. It is of much greater length than the first publication and is a news item of what transpired at the meeting of the Sanitation Committee of the City Council of Santa Fe, announcement of which appeared in the first publication. It is not charged that the publication gives a garbled, false, incomplete or unfair report of the meeting. Hence, it must be assumed it met all these essentials to fair and impartial reporting. We must examine it then to see if in some other respect and on its face it necessarily libels the plaintiff. In determining this question the article alone must be construed, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. To be libelous per se, the writing must be defamatory *on its face* and such a meaning must be deduced *"within the four corners thereof."* Jacobs v. Transcontinental & Western Air,

Inc., 358 Mo. 674, 216 S.W.2d 523, 6 A.L.R. 2d 1003 and annotation at 1008; Wiley v. Oklahoma Press Pub. Co., 106 Okl. '52, 233 P. 224, 40 A.L.R. 573; Chase v. New Mexico Pub. Co., infra. Furthermore the defamatory meaning must be the only one of which the questioned writing is susceptible. Dillard v. Shattuck, infra.

It is obvious from viewing the second publication as a whole that the purpose of the meeting was to discuss and arrive at conclusions whether to advert to a strict enforcement of some ordinance of the city relating to milk sold in the city. The terms of this ordinance are not disclosed in the pleadings of any of the parties. Unquestionably, and owing to a milk shortage during the war the city had eased up on a strict enforcement of this ordinance by permitting Grade "A" labeling of the pasteurized product from all sources. Now the city was preparing to tighten up on enforcement, or contemplated doing so. So far as the publication discloses this condition of indulgence had applied at some time or another to *all dairies*. Now they were endeavoring to bring themselves into a strict compliance with the ordinance. Some had succeeded and as the article disclosed there was willingness and endeavor on the part of all to comply though some felt they should be given a reasonable time for doing so, the city to fix a deadline for strict enforcement. There was nowhere an intimation nor any implication that the plaintiff or any other dairy was selling or had sold impure or contaminated milk. Note the problems facing the city from these excerpts from the publication.

" Santa Fe has been getting milk from both approved and unapproved dairies, the physician said. Some of the latter, he added, are in Colorado which does not require the Bang's test. In the war years, to avert a milk famine, the city eased up on its standards, permitting the Grade 'A' labeling of the pasteurized product of all sources. This condition still prevails.

" 'The public had no way of telling what kind of milk it is getting,' said Doctor Lathrop. 'There should be some means of differentiating between the grades, by the price or in some other way. It may be that the thing to do is to cut off unapproved milk and face a shortage. As yet I don't know what to do. I wanted help on this particular problem—that's the purpose of this meeting—and I'm not getting it.'

\* \* \* \* \* \*

"Dr. James R. Scott, state health director, said his department's only interest in the local situation was to see the milk labeled correctly. The barriers had been down for several years. There had to be an end to this sometime—just when was the city's problem.

"Shenk, putting himself on record for improving the supply, suggested setting a deadline for strict enforcement, say next Sept. 1. His distributing plant didn't require it, he said, but he believed the producers should be allowed a reasonable time to put their dairies in shape. Just now, he added, they were not making money; they were dependent upon the grass in the summer to tide them over.

    \*    \*    \*    \*    \*    \*

"There was no reason why Grade C milk should not be sold if it were so labeled, Lathrop said.

"Slade stated the Santa Fe milk shed as good as any in the state, better than some."

▮ We need not go beyond our own decisions to determine whether these publications have a per se character. Dillard v. Shattuck, 36 N.M. 202, 11 P.2d 543, and Chase v. New Mexico Publishing Co., 53 N.M. 145, 203 P.2d 594. These decisions lay down certain controlling principles in the law of libel and slander. A cardinal test in passing upon the per se character of a claimed slander or libel is to reject the innuendo. If the words need the aid of an innuedo, they are not per se libelous and the fact that the pleader supplies one furnishes rather persuasive proof of a belief on his part that the statements relied on need it. If they do not require the innuendo, then, naturally, they are libelous per se. .

▮ Furthermore, the statements claimed to be libelous, if such per se, must carry but a single meaning, and it an opprobrious or defamatory one. The language said to be libelous should be given its plain and natural meaning and be viewed by the court as other people reading it would ordinarily understand and give it meaning. Nor may any special knowledge of the facts, possessed by the parties concerned, be brought to bear to give meaning to the words said to be libelous. They are to be construed as a stranger might view them without the aid of any such knowledge as that possessed by the parties mentioned. And finally, if the words are not libelous per se, special damages must be both alleged and proved to support a recovery.

The foregoing principles, all of which are well established in the law of libel and slander, are enumerated and approved either in case of Dillard v. Shattuck, supra, or Chase v. New Mexico Publishing Co., supra. An application of them to the two publications made the basis of the present action affirms the correctness of the trial court's ruling in sustaining the motion of defendants and dismissing the complaint. The publications relied upon are not libelous per se and, hence, actionable without pleading and proving special damage. In

its order sustaining defendants' motion to dismiss, the trial court ruled the articles in question were neither libelous per se nor per quod and that the motion was well taken and should be sustained. Counsel for defendants, without arguing correctness of the trial court's ruling that the articles are not libelous per quod, say that even if so considered, nevertheless, there is no basis for granting a recovery since special damages are not pleaded with the particularity required. The allegation relied upon in this behalf is as follows:

" * * * that plaintiff Del Rico Company suffered a loss of profits of at least $4,350.00 and suffered a loss of at least $42,775.00 from operations and was ultimately forced to sell its business at a loss of at least $160,000.00."

We think the weight of authority, as well as the more persuasive, supports the position of defendants as to insufficiency of the foregoing allegations as a basis for awarding special damages. See Newell on Slander and Libel (4th Ed.) 841–844; Odgers on Libel and Slander (5th Ed.) 383; 53 C.J.S., Libel and Slander, § 170(c), page 269; 15 Am.Jur. 747, § 305, under "Damages" and 33 Am.Jur. 222, § 243, under "Libel and Slander"; Wood v. Hannett, 35 N.M. 23, 289 P. 590; Dillard v. Shattuck, supra; Chase v. New Mexico Publishing Co., supra; Shaw Cleaners & Dyers v. Des Moines Dress Club, 215 Iowa 1130, 245 N.W. 231, 86 A.L.R. 839 and annotation at 848; Life Printing & Publishing Co. v. Field, 324 Ill.App. 254, 58 N.E.2d 307; Thompson v. Osawatomie Pub. Co., 159 Kan. 562, 156 P.2d 506; Erick Bowman Remedy Co. v. Jensen Salsbery Laboratories, 8 Cir., 17 F.2d 255, 52 A.L.R. 1187; Maas v. National Casualty Co., 4 Cir., 97 F.2d 247.

In Newell on Slander and Libel, supra, the author states:

"An allegation stating generally that in consequence of the defendant's words the plaintiff has lost a large sum of money, or that his practice or business has declined, is not sufficiently precise where the words are not actionable per se. The names of the persons who have ceased to employ the plaintiff, or who would have commenced to deal with him had not the defendant dissuaded them, should be set out in the statement, and they themselves called as witnesses at the trial to state their reason for not dealing with the plaintiff."

The author of an extensive and helpful annotation on the subject in 86 A.L.R. 848, has this to say:

"The rules applicable in pleading damages generally apply to actions for libel or slander. In such cases it is essential for a plaintiff to allege as well as to prove special damages before he is entitled to recover, unless

the defamatory words are actionable per se.

\* \* \* \* \* \*

"In a great number of cases it has been held that, where the plaintiff alleges special damage by reason of the defamatory publication, which, although it is not actionable per se, damages him in his business, trade, or profession, the loss of customers, contracts, sales, patients, or clients, the particular contracts, sales, customers, patients or clients lost must be alleged as a prerequisite to recovery of special damages."

In holding as we do that the allegation of special damage here relied on does not suffice to support proof on the subject we are not unmindful of the innumerable cases cited and discussed in the exhaustive briefs filed by counsel for plaintiff which stand for a more liberal rule in the pleading of special damage such as Ellsworth v. Martindale-Hubbell Law Directory, Inc., 68 N. D. 425, 280 N.W. 879, and Walter v. Bender, 35 A.2d 435, 22 N.J. Misc. 44, and still others which could be cited. In so far as any of them support a holding that the questioned allegation is an adequate pleading of special damages, we simply disagree with them. We do not question that there may be circumstances which would justify ameliorating the rigors of the rule in its requirement as to particularity in

pleading the special damage resulting from the defamatory words or writing. What we do say is that, tested by any rule, the allegation of special damage here made does not suffice. Cf. 1941 Comp., § 19–101 Rules of Civil Procedure, rule 9(g); Riley v. Dun & Bradstreet, Inc., 6 Cir., 172 F.2d 303; Parmelee v. Hearst Pub. Co., 341 Ill. App. 339, 93 N.E.2d 512; Taxpayers' League of Bell County v. Sun Pub. Co., 256 Ky. 37, 75 S.W.2d 564; Holliday v. Maryland Casualty Co., 115 Miss. 56, 75 So. 764; Ledlie v. Wallen, 17 Mont. 150, 42 P. 289.

█ Here we have only the broad, general allegation that plaintiff suffered loss of profits of at least $4,350.00. No effort is made to particularize as to how aggregate of lost profits claimed was arrived at. It draws no comparison between what the profits were since the alleged libel as contrasted with their amount in a like period before the publication. Was the loss of profits due to a loss of customers solely? If so, who were they or, at least, the names of some of them known to plaintiff to the end that defendants may make some sort of check. Here the complaint gives no names nor pleads an inability to do so, nor that there are others whose names are unknown. How did the loss from operations arise? From what phase of operations? But why go on? These observations but emphasize the generality of the purported allegation of special damage. It is obvious a de-

fendant could not prepare to meet with proof an allegation so broad in its sweep. We think the trial court properly held the allegation insufficient.

Finally, the plaintiff urges upon us that even if the publications are not defamatory per se or per quod the complaint stated a cause of action against defendants "for maliciously publishing written falsehoods calculated to produce injuries to appellant (plaintiff) and which did produce injuries to him as a natural and probable consequence of said publications." The argument under this point quotes from Ratcliff v. Evans, 2 Q.B.D. 524, an English case to the effect that written or oral falsehoods, not actionable per se nor even defamatory, if maliciously published and calculated to produce and do produce actual damage, will support an action *on the case* for damages, such an action being neither one of libel nor of slander.

They say if plaintiff has failed to state a cause of action in libel, nevertheless, the complaint is good as an action on the case for damages. Counsel for defendants answer that no such theory was ever presented below, the plaintiff insisting that it was. We need not enter the controversy since even if raised below, special damage both in pleading and proof admittedly is essential to recovery. Accordingly, what we have said about special damage hereinabove applies with equal force here.

There is no sufficient plea of special damage and we do not feel called upon to enter into a discussion of the merits of the point plaintiff seeks to raise. If meritorious it would not aid him for want of a proper plea of special damage.

Much is said in briefs for both parties on the subject of the defendants' plea of privilege. They assert it affords an absolute defense but are met by a claim on plaintiff's part that the question was not reserved below by definite showing that the motion was sustained on that ground, the order of denial itself mentioning only the court's conclusion that the publications were not libelous per se, nor per quod. Certainly, no subject we can think of touches more closely the public health and welfare than a city's milk supply. It would greatly curtail the freedom of expression for the public good if the press were unduly restricted in reporting or offering constructive criticism in a matter so vital to the health of all. Cf. 33 Am.Jur. 161, § 168, under "Libel and Slander"; Begley v. Louisville Times Co., 272 Ky. 805, 115 S.W.2d 345; Glass v. Ickes, 73 App.D.C. 3, 117 F.2d 273, 132 A.L.R. 1328.

Counsel for plaintiff counter with a claim that the privilege invoked is a qualified one only, citing 33 Am.Jur. 123, § 124 et seq.; Heitzeberg v. Von Hoffmann Press, 340 Mo. 265, 100 S.W.2d 307, and other authorities. They insist that if statements

otherwise within the privilege are made maliciously with intent to cause harm to plaintiff, they are actionable. They point out in their complaint the allegation that the statements said to be libelous were "maliciously" made thereby, as counsel insist, bringing their complaint within the protection of the authorities cited by them. These are interesting questions but we deem them unnecessary to a decision. We are satisfied the complaint is bad for the reasons pointed out. The trial court correctly sustained the defendants' motion to dismiss and its judgment should be affirmed.

It is so ordered.

LUJAN, C. J., and McGHEE, COMPTON, and COORS, JJ., concur.