731 P.2d 1335

**Bob STOVER, Plaintiff-Appellee,**

v.

**JOURNAL PUBLISHING COMPANY, Albuquerque Publishing Company, and Thompson H. Lang, Defendants-Appellants.**

No. 8503.

Court of Appeals of New Mexico.

Dec. 3, 1985.

Certiorari Quashed Jan. 28, 1987.

William S. Dixon, Jill E. Adams, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, Nathaniel H. Akerman, Pryor, Cashman, Sherman & Flynn, New York City, for defendants-appellants.

Turner W. Branch, Nancy L. Simmons, Branch, Eaton, Keenan & Watson, A.J. Ferrara, Joseph P. Paone, Albuquerque, for plaintiff-appellee.

## OPINION

BIVINS, Judge.

This appeal presents the question whether a publisher loses the protection of the "fair report privilege" when statements reported fairly and accurately in a newspaper article originate from a witness located by the publisher in litigation involving the publisher. The parties appear to agree that this precise question has not heretofore been decided in New Mexico or by any other jurisdiction. Based on our own research, we agree, at least in terms of applying a self-reported statement exception to a member of the media who is also a party to a lawsuit.

The present action by plaintiff Bob Stover against Journal Publishing Company, Albuquerque Publishing Company, and Thompson H. Lang for defamation grew out of an earlier lawsuit brought by attorney William Marchiondo against one or more of the defendants in this case. As part of the pretrial discovery in the Marchiondo case, the *Journal* located several federally-protected witnesses, one of whom was Jerome Sternlieb, a self-acknowledged former underworld crime participant and a convicted felon. Because federally-protect-ed witnesses are not available for interviews, the trial court ordered the *Journal* to provide Marchiondo with a pre-deposition affidavit of Sternlieb, disclosing the content of his expected testimony.

In the relevant part of his affidavit, Sternlieb recounted a visit he made to Albuquerque accompanied by James Vincent Napoli, Jr., "Lefty." In his affidavit, Sternlieb identified "Lefty" as the son of an underworld crime figure, James Vincent Napoli, Sr. According to Sternlieb:

8. On the morning after our arrival Lefty called an individual by the name of Bob Stover whom Lefty described as the Albuquerque Police Chief. Later this individual came to our room, introduced himself, talked briefly, including asking Lefty how Lefty's father was doing, and offered to drive us around Albuquerque in his automobile.

9. Bob Stover in fact drove us around Albuquerque that day first driving us past a shopping center which he stated was one of the properties in which James Vincent Napoli, Sr. had an interest, together with William C. Marchiondo and Governor Jerry Apodaca. This shopping center was not quite completed at this time. Stover stated that Governor Jerry Apodaca's wife and James Vincent Napoli's wife were going to operate a boutique type store in the shopping center.

On January 12, 1982, the *Journal* filed the Sternlieb affidavit which the trial court ordered sealed. The trial court, however, permitted Marchiondo's lawyer to provide a copy of the affidavit to Stover and to the former governor because their names were mentioned in the affidavit. At the time, Stover was a candidate for sheriff of Bernalillo County, and Apodaca was a candidate for the United States Senate.

Apodaca's attorney called Judge Traub on April 12, 1982 to advise the court that Apodaca intended to call a press conference on April 14, 1982 to release the Sternlieb affidavit and to rebut its contents as applied to him. The trial court scheduled a hearing to decide whether the affidavit should be unsealed. Stover did not attend

the hearing, and it is disputed whether he received notice of the hearing.

The *Journal* filed an unopposed motion to unseal the affidavit. At the hearing, Marchiondo's lawyer, at Stover's request, filed an affidavit by Stover denying the Sternlieb allegations. Prior to the unsealing of the Sternlieb affidavit, Stover was interviewed by KOAT–TV concerning Sternlieb's claims. On that evening, April 13, 1982, KOAT–TV, KOB–TV, and KGGM–TV each carried accounts of the Sternlieb affidavit as well as Stover's rebuttal.

The following day, April 14, 1982, the *Journal* published an article concerning the affidavit and Stover's denials. The article appeared on the front page of the newspaper. Appearing next to the article were the pictures of Stover, Napoli, Sr., Napoli, Jr., and Apodaca. The article recounted the allegations of the affidavit as well as the rebuttal contained in Stover's affidavit.

In his amended complaint for defamation, Stover sought damages on the basis of the filing of the Sternlieb affidavit and also the publication of the April 14th article. Stover contends that the *Journal* published the article with "a high degree of awareness of the [affidavit's] probable falsity." Stover's second cause of action was against defendant Lang. This cause of action primarily concerned Lang's statements, which appeared in the newspaper article.

Defendants moved for summary judgment on the bases that: (1) the filing of the Sternlieb affidavit was absolutely privileged; (2) the newspaper article reporting the affidavit was protected under the fair report privilege; and (3) defendant Lang's statements in the article were not susceptible of a defamatory meaning, were constitutionally protected opinions, and were true. For the purposes of defendants' motion only, the trial court assumed that the Sternlieb statements, as related to Stover, were defamatory and that defendants had "a high awareness of their probable falsity."

Following a hearing, the trial judge, Judge Sitterly, ruled that the affidavit was generated in a judicial proceeding, was reasonably related to that proceeding, and was, therefore, absolutely privileged. The trial court also ruled that the statements of defendant Lang and the placement of the pictures were not susceptible of defamatory meanings. As a result of these holdings, the trial court granted partial summary judgment in favor of all defendants, regarding the filing of the affidavit, the statements of Lang, and the positioning of the pictures in the news article.

The trial court, however, denied summary judgment as to the publication of the April 14, 1982 news article. While ruling, as a matter of law, that the article was fair and accurate, the trial court held that the fair report privilege "does not apply here due to comment (c) of Section 611, Restatement, Torts 2d," which provides in applicable part, "A person cannot confer this [fair report] privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated."

After skillfully posturing the issues, the trial court certified this question for interlocutory appeal, pursuant to NMSA 1978, Section 39–3–4, as involving a controlling question of law as to which there is substantial ground for the difference of opinion, and that a resolution would materially advance the ultimate termination of this litigation. In fact, the trial court indicated that a definitive decision "will entirely dispose of this case in light of the court's other rulings."

This court agreed to accept defendants' application for interlocutory appeal to consider the question. Having done so, we now hold that even if comment (c) to Section 611 of the Restatement (Second) were adopted, it has no application to the facts of this case. Accordingly, we hold that the *Journal* did not lose the protection of the fair report privilege when it published an article which fairly and accurately reported the statements of a witness whom the *Journal* had located in the course of pre-

paring for litigation in which the *Journal* was a defendant. For a clearer understanding of the question, we first discuss the fair report privilege. We then shall address the specific question raised.

### 1. The fair report privilege.

█ The essence of the fair report privilege is that no liability will attach for the republication of the defamatory statements so long as the republication is a fair and accurate report of an official or public proceeding. The Restatement (Second) of Torts § 611 (1977) articulates the privilege as follows:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

New Mexico first recognized the fair report privilege in 1919 in *Henderson v. Dreyfus,* where the supreme court quoted with approval that " '[e]very impartial and accurate report of any proceeding in a public law court is privileged.' " 26 N.M. 541, 566, 191 P. 442, 452 (1919), *quoting from* Newell on Slander and Libel § 646 (3d ed.). *See also Del Rico Co. v. New Mexican, Inc.,* 56 N.M. 538, 246 P.2d 206 (1952), *overruled on other grounds, Marchiondo v. Brown,* 98 N.M. 394, 404, 649 P.2d 462, 472 (1982); *Rockafellow v. New Mexico State Tribune Co.,* 74 N.M. 652, 397 P.2d 303 (1964); *Hubbard v. Journal Publishing Co.,* 69 N.M. 473, 368 P.2d 147 (1962).

Three reasons have been advanced for subordinating the defamed person's interest in his reputation to the interests of the public. Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report,* 54 N.Y.U. L.Rev. 469, 483 (1979). The first is the agency theory. The rationale of the agency theory is that the reporter serves as the agent of the citizen who was absent at the public proceeding. The New Mexico Supreme Court recognized this function in *Del Rico Co. v. New Mexican, Inc.,* ac-

knowledging that "[o]nly a small fraction of the population ... would be able to attend meetings of this kind personally. Consequently, it was but natural that they should look to the press for information concerning them." 56 N.M. at 545, 246 P.2d at 211.

The second theory involves the public's supervisory function. This theory embodies recognition of the public's duty to scrutinize official conduct and to determine whether public policies and institutions serve public needs. Sowle, *supra* at 484–86; *see also Hughes v. Washington Daily News Co.,* 193 F.2d 922 (D.D.C.1952).

Finally, the fair report privilege is justified on the basis of its information function. The need of a self-governing society to be apprised fully of public concerns and controversies has been deemed to outweigh an individual's reputational concerns. Sowle, *supra* at 487.

█ Because the fair report privilege has the public interest as its foundation, the truth or falsity of statements made in the proceedings and reported to the public does not merit inquiry. *Ricci v. Venture Magazine, Inc.,* 574 F.Supp. 1563 (D.Mass. 1983). The fact that statements made in the proceedings were false will not upset the privilege, not even when the reporter knew that the statements were false and reported them anyway. *Id.;* Restatement, *supra,* § 611, comment (a). There is a two-pronged justification for the lack of relevance concerning the truth or falsity of the statements and the reporter's knowledge thereof. First, the public is best served by exposure to the actual content of the official proceedings, regardless of whether all of the statements were true or false. *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964). Even if the reporter knows of the falsity of a statement, he is not restrained from reporting the information. The public has a right to access to a full account of a proceeding, not only to satisfy its informational concerns but to fulfill its supervisory duties. *Bell v. Associated Press,* 584 F.Supp. 128 (D.D.C.1984). Second, to require a reporter to ascertain

the truth or falsity of every statement uttered or published in an official or public proceeding would impose an intolerable burden on the press. *See,* 52 A.L.I. Proc. 186 (1975). If the press faced possible civil liability for every falsity published, coverage would be reduced and, as a result, the public's needs would suffer.

Thus, the fair report privilege protects against liability "even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false." Restatement, *supra,* § 611, comment (a).

■ Abuse of the privilege takes place, however, when the publisher does not give a fair and accurate report of the proceeding. As stated in *Henderson v. Dreyfus:*

> While a person may publish a correct account of the proceedings in a court of justice, yet, if he discolors or garbles the proceedings, or adds comments and insinuations of his own in order to asperse the character of the parties concerned, it is libelous, and not privileged.

26 N.M. at 566, 191 P. at 452 (citation omitted).

■ The trial court held as a matter of law that the *Journal's* April 14, 1982 news article fairly and accurately reported the contents of the Sternlieb affidavit, a component of the judicial proceedings in the Marchiondo case. Therefore, unless the privilege is unavailable to defendants, as Stover claims, the privilege applies and insulates defendants from liability. Stover relies on comment (c) to Section 611 of the Restatement (Second) to support his claim. We now turn our attention to the pivotal question.

## 2. Whether defendants may exercise the privilege.

Comment (c) to Section 611 of the Restatement (Second) provides in pertinent part: "A person cannot confer this [fair report] privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated." Restatement, *supra,* § 611, comment (c).

The parties sharply disagree as to whether comment (c), which purports to create a self-reported statement exception to the fair report privilege, was ever presented to or voted on by the American Law Institute (A.L.I.), publishers of the Restatement. We need not enter this debate or attempt to resolve the dispute, if, in fact, one exists. For the purposes of this appeal, we assume that the self-reported statement exception was adopted, and further assume that it expresses the common law. We make these assumptions because even if the exception represents the law, it does not apply, in any event, to the facts of the present case.

■ The self-reported statement exception does not apply for at least two reasons. First, the original defamatory publication was made by Sternlieb, not the *Journal* defendants. Stover attempts to overcome this distinction by arguing that John S. Donahue, an investigator for the *Journal* and an original defendant in this action, met with Sternlieb and provided Sternlieb false information which was incorporated in the affidavit. This argument fails for want of factual support. The record reflects that Sternlieb made substantially the same allegations to the Federal Bureau of Investigation more than a year before Donahue's alleged meeting with him. Moreover, Stover's original claim of conspiracy, based in part on allegations that defendants joined with Sternlieb to create the affidavit, was dismissed with prejudice.

Second, the exception, by its own terms, was obviously intended to prevent the abuse of the fair report privilege. For example, a person might bring a suit or hold a public meeting not with the intention of pursuing the purported objective but to cause harm to another, by pleading or announcing defamatory matter and then using the protective shield of the fair report privilege to republish the defamatory matter to the world or to a targeted audience.

Although decided on the basis of a New York statute, not comment (c), the case of *Williams v. Williams,* 23 N.Y.2d 592, 298

N.Y.S.2d 473, 246 N.E.2d 333 (1969), is helpful in understanding the exception. In that case, the defendants, through their corporation, had initiated an action against plaintiff alleging that plaintiff had conspired with others to misappropriate and to misuse the company's trade secrets and assets. Defendant then circulated copies of the complaint to members of plaintiff's trade. Plaintiff brought suit against defendants claiming, among other things, that the action against him was totally without basis in fact, and was begun for the purpose of ruining his business reputation. Defendants asserted the fair report privilege as a defense and asked that plaintiff's complaint be dismissed. *Williams* affirmed denial of that motion, holding that the fair report privilege, as found in Section 74 of the New York Civil Rights Law, Consol.Laws, c. 6, was never intended to permit a person maliciously to institute a judicial proceeding, alleging false and defamatory charges, then to circulate a press release or other communication based thereon, and, ultimately to escape liability by invoking the fair report privilege statute. Thus, the court grafted on to the fair report privilege statute, which otherwise provided an absolute privilege as long as the publication fairly and truly reported the judicial proceeding, an implied exception to meet the circumstances of that case.

In the case before us, the *Journal* defendants did not instigate the judicial proceedings in which the Sternlieb affidavit was filed; they were unwilling defendants. Further, the unrefuted evidence before us reflects that the *Journal's* newsgathering activities were executed completely independent of and separate from its defense of the Marchiondo case. Thus, the exception to the fair report privilege, as presented in comment (c), has no application to the facts of this case. The decision of whether that exception should be adopted at all will have to await a proper case.

■ Defendants argue, and we agree, that to apply the comment (c) exception to this case would undermine an important purpose of the fair report privilege, which is to allow the report of that which the public could have independently heard or read. The Sternlieb affidavit was unsealed and, therefore, available for public examination. As noted, it had already been reported by several television stations before the *Journal* published its article.

■ We also agree that to apply the exception under the circumstances of this case could lead to "inaccurate and unintelligible reporting." To relegate the *Journal* to publishing only rebuttal testimony, while denying it the right to report fairly and accurately the contents of the testimony in question, would result in skewed, garbled reporting, defeating the purpose of the privilege.

■ Stover argues that the *Journal* defendants lost their agency roles, that is, to act as the agents of the citizen who was absent at the proceeding. Because defendants were parties to the *Marchiondo* case, Stover would place a burden on them to ascertain the truth of witnesses' statements before republishing them. Quite aside from the fact that the *Journal* defendants were unwilling defendants to that case and such burden would not be imposed on other members of the press, we reject as unsound a requirement that the media mix its responsibilities as an independent newsgatherer with its role in the defense of litigation in which it may be involved. To do so would not only be administratively impractical but likely would lead to violations of the ethical standards of the newspaper and legal professions.

■ Finally, it would bring about a strange result, indeed, to accord Sternlieb absolute immunity for making defamatory statements under the judicial privilege, *see Stryker v. Barbers Super Markets Inc.*, 81 N.M. 44, 462 P.2d 629 (Ct.App.1969), while making defendants liable for having fairly and accurately reported the statements. The fair report privilege protects against such a result.

■ The parties have also argued the certified question on the basis of the First Amendment's guarantees of freedom of

speech and freedom of the press. Because the question can be answered under the common law, we need not reach the constitutional issue. Courts will not decide constitutional questions unless necessary to the disposition of the case. *State v. Campbell,* 75 N.M. 86, 400 P.2d 956 (1965); *In re Bunnell,* 100 N.M. 242, 668 P.2d 1119 (Ct. App.1983).

The case is remanded to district court for further proceedings in accordance with this opinion. Defendants shall recover costs of appeal.

**IT IS SO ORDERED.**

DONNELLY, C.J., and WOOD, J., concur.