**TEILHABER MANUFACTURING COMPANY, a Colorado corporation, Plaintiff–Appellee and Cross–Appellant,**

**v.**

**UNARCO MATERIALS STORAGE, A DIVISION OF UNARCO INDUSTRIES, INC., Defendant–Appellant and Cross–Appellee.**

**Nos. 87CA0363, 87CA0070.**

Colorado Court of Appeals,
Div. IV.

Nov. 16, 1989.

Rehearing Denied Dec. 21, 1989.

Certiorari Granted May 14, 1990.

Kripke, Epstein & Lawrence P.C., Kenneth N. Kripke and Scott W. Lawrence, Denver, for plaintiff-appellee and cross-appellant.

Weller, Friedrich, Ward & Andrew, J. Mark Smith and Marsha P. Tedstrom, Denver, for defendant-appellant and cross-appellee.

Opinion by Judge METZGER.

Defendant, Unarco Materials Storage, Inc. (Unarco), appeals the judgment entered upon a jury verdict finding it liable for product disparagement. Plaintiff, Teilhaber Manufacturing Company (Teilhaber), cross-appeals, asserting that the trial court erred in denying its request for prejudgment interest. We affirm in part, reverse in part, and remand with directions.

Teilhaber developed and produced the "Cue–Rack," an industrial storage rack, and began competing with Unarco, which also produced an industrial storage rack. Feeling the adverse effects of this competition, Unarco sought to obtain a Cue–Rack to conduct independent tests and thus compare the Cue–Rack to its own product. The storage rack ultimately obtained was actually a hybrid comprised of uprights manufactured by Teilhaber for the Cue–Rack and beams manufactured by another company.

After conducting some tests on this hybrid rack, Unarco disseminated a "preliminary test report," which purported to evaluate the Cue–Rack, to its employees and distributors. Some distributors informed their purchasers of these reports. This report, written by Unarco's chief engineer, disputed Teilhaber's representations concerning the Cue–Rack's strength and weight-bearing capacity. The report is appended to this opinion.

Teilhaber sued Unarco for product disparagement, contending that the statements made in the report were false. Unarco denied liability, asserting that the report contained only opinions and accurate statements of fact, which were protected by the First Amendment.

The jury returned a verdict in favor of Teilhaber for $1,763,131 plus costs. The trial court denied Teilhaber's request for prejudgment or moratory interest. This appeal followed.

I.

Unarco contends the trial court erred in denying its motion for directed verdict. It argues that the test report, to the extent it is disparaging, consists of opinion and/or substantially true statements of fact and, therefore, is protected by the First Amendment. We find no error.

■ Restatement (Second) of Torts §§ 623(A) and 624 (1976), which we here adopt, provide:

"One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard to its truth or falsity.

. . . . .

The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of a false statement disparaging another's property rights in land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary harm to the other through the conduct of third persons in respect to the other's interests in the property."

■ The tort of product disparagement requires proof of the following elements: (1) a false statement; (2) published to a third party; (3) derogatory to the plaintiff's business in general, to the title to his property, or its quality; (4) through which the defendant intended to cause harm to the plaintiff's pecuniary interest, or either recognized or should have recognized that it was likely to do so; (5) with malice; (6) thus, causing special damages. *See*

*Henderson v. Times Mirror Co.,* 669 F.Supp. 356 (D.Colo.1987). *Williams v. Burns,* 540 F.Supp. 1243 (D.Colo.1982).

In this case, the existence of some of these elements was undisputed. Both parties agree as to the falsity of the statements that the test was performed on a Cue–Rack "furnished" by Teilhaber. Because the Cue–Rack was a hybrid, this admitted falsity is pervasive and renders all the reported test results false as regards the Cue–Rack. Thus, any opinion was based, necessarily, on false facts. Moreover, the fact that the rack tested was a hybrid was neither disclosed in, nor could it be inferred from, the report. As to the other elements, our examination of the record reveals sufficient evidence to support a jury finding in favor of Teilhaber on each. Accordingly, recovery was proper unless the statements in the report fall within the ambit of First Amendment protection.

The constitutional protections afforded a defendant in a defamation action are applicable to a defendant in a product disparagement action. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Thus, in general, a statement of opinion, as opposed to a statement of fact, will be protected expression under the First Amendment.

However, not all forms of opinion are entitled to such protection. An opinion will support a defamation action if the language is defamatory and the underlying defamatory facts which provide a basis for the opinion are false and are not disclosed in context. *Burns v. McGraw–Hill Broadcasting Co., Inc.,* 659 P.2d 1351 (Colo.1983); Restatement (Second) of Torts, § 566 (1976). Such was the case here.

Unarco does not dispute that the pivotal facts underlying the report—that the test was not conducted on a Cue–Rack furnished by Teilhaber—are false and undisclosed. Consequently, any opinions in the report are not protected by the First Amendment. Accordingly, the trial court did not err in denying Unarco's motion for directed verdict.

II.

Unarco next contends that the trial court erroneously admitted evidence concerning general business damages, in violation of the general rule that only special damages may be recovered in a product disparagement action. Again, we find no error.

In a product disparagement action, the plaintiff must always prove special damages. *Williams v. Burns, supra.* He is required to establish a pecuniary loss that has been realized or liquidated, as in the case of specific lost sales. W. Keeton, *Prosser & Keeton on Torts* § 128 (1984). If a plaintiff cannot show special damages, no cause of action is established. *Williams v. Burns, supra.* To make the required showing, a plaintiff usually must identify those persons who refuse to purchase his product because of the disparagement. *See* W. Keeton, *supra* § 128 (1984).

Strict imposition of this requirement has led to many difficulties. Formerly, it was nearly always held that it was not enough to show a general decline in business following the publication of the falsehood. *See Electric Furnace Corp. v. Deering Milliken Research Corp.,* 383 F.2d 352 (6th Cir.1967), *McGaw v. Webster,* 79 N.M. 104, 440 P.2d 296 (1968). This was so, even if there was evidence eliminating other causes for the decline. *See Hunt Oil Co. v. Berry,* 227 Miss. 234, 86 So.2d 7, *corrected* 227 Miss. 680, 86 So.2d 854 (1956). Thus, a plaintiff was required to identify the particular purchasers who refrained from dealing with him and had to specify the transactions of which he claims to have been deprived. *Del Rico Co. v. New Mexican, Inc.,* 56 N.M. 538, 246 P.2d 206 (1952). But, if there was wide dissemination of the disparagement to persons unknown, this was obviously impossible. *W. Keeton, supra,* § 128 (1984).

Accordingly, the current tendency rejects such an arbitrary rule. It is guided by the principles set out in *Ratcliffe v. Evans,* 2 Q.B. 524 (C.A.1892), one of the first opin-

ions to reject the strict approach. There, the court observed:

"As much certainty and particularity must be insisted on, both in pleading and proof of damages, as is reasonable, having regard to the circumstances and to the nature of the acts themselves by which the damage is done. To insist upon less would be to relax old and intelligible principles. To insist upon more would be the vainest pedantry."

Currently, the plaintiff is required to be particular only if it is reasonable to expect him to be so. *See Charlottesville Music Center, Inc. v. Magnepan, Inc.*, 655 F.2d 38 (4th Cir.1981); *Continental Nut Co. v. Robert L. Berner Corp.*, 393 F.2d 283 (7th Cir.1968). If it is not a practical possibility to show specific losses, damages may then be proved by evidence similar to that used to prove lost profits resulting from a breach of contract. *See Charles Atlas, Ltd. v. Time–Life Books, Inc.*, 570 F.Supp. 150 (S.D.N.Y. 1983). Consequently, if a plaintiff can present sufficient evidence, using detailed statistical and expert proof, to exclude the possibility that other factors caused the loss of general business, recovery is allowed. *See Barkhorn v. Adlib Associates, Inc.*, 203 F.Supp. 121 (D.Haw.1962).

Teilhaber presented evidence that identification of end users of its product was impossible because product sales were made only through independent distributors, over whom Teilhaber had no control. This explanation was sufficient to satisfy application of the current approach. The evidence concerning damages consisted of extensive and complex statistical and expert evaluations of the industry, the market, and Teilhaber's business pattern. This evidence provides ample support for the jury's verdict, and we must, therefore, up-

hold it on appeal. *Smith v. Hoyer*, 697 P.2d 761 (Colo.App.1984).

## III.

We reject Unarco's assertion that the trial court abused its discretion in refusing to grant a continuance or to impose more severe sanctions on Teilhaber for its failure to comply with an order to compel discovery.

These decisions lie within the sound discretion of the trial court and cannot be reversed unless manifestly arbitrary, unreasonable, or unfair. *People v. Milton*, 732 P.2d 1199 (Colo.1987).

In our view, the sanctions selected by the trial court, when viewed in light of the issues in the case, the consequences of imposition of other sanctions, and the effect on an already prolonged lawsuit, were not so far outside the realm of choice as to constitute an abuse of discretion.

## IV.

On cross-appeal, Teilhaber's asserts that the trial court erred in refusing to award either prejudgment or moratory interest. We agree.

The trial court, when making its decision, did not have the benefit of our supreme court's opinion in *Mesa Sand & Gravel v. Landfill, Inc.*, 776 P.2d 362 (Colo.1989) which mandates prejudgment interest in cases such as this. *See also* § 5–12–102(1)(a) & (3), C.R.S. (1989 Cum. Supp.).

The judgment is affirmed in part, reversed in part, and remanded for a determination of prejudgment interest, and entry of an amended judgment.

KELLY, C.J., and FISCHBACH, J., concur.

APPENDIX

PRELIMINARY TEST REPORT

ON CUE (Q) RACK

Furnished by Teilhaber Mfg. Corp.
Bloomfield, Colorado

Test Conducted July 17, 18, 1979
at Unarco's Nashville Warehouse
Monitored by Pittsburgh
Testing Laboratory

Unarco Materials Sto.

Division of
Unarco Industries, Inc.

332 S. Michigan Ave.
Chicago, Illinois 60604
Phone 312 341 1234

Manufacturers of
Sturdi-Bilt and
UNARCO II Products

①.

GENERAL INFORMATION

Q-Rack has copied an old version of the Interlake Connection, but did a very poor job of it.

UPRIGHT FRAME

144" x 42" - 25,000# capacity ordered.
QMF 23 furnished

16
① Gage Thickness **THINNEST IN THE INDUSTRY!!**

② Can "Squeeze" 4" Long Section with Hand Pressure!!

③ Round Holes in Sides line up with Keyholes in Face. (Interlake Staggered 10-Years Ago).

④ Horizontals Off 1" from Level. (Poor fixturing at Welding).

⑤ Light Gage Damages Easily in Shipment. (One Post Crunched Up).

## BEAMS

106" Long, 6,700# capacity ordered.
Literature shows ALL Double Flange
Beams  ⌐┐  3", 4", 5" & 6" Deep.

⑥ 4" Tubular Beams Furnished

⑦ 2-Beams  A  Type

2-Beams  B  Type

B  Is the Poorest
Shaped Beam Ever
Witnessed by Test
Committee

(A)

(B)

## TEST DESCRIPTION

Shelf 12" off Floor (with Wood Dunnage) was loaded with cartons of
Sturdi-Bilt S-303H connectors (Uniform Load) 1-Layer = 1,035#.

⑧ At 3-Layers (3,105#), the bottom of the Corner Angle had Pulled
Away from the Post 1/8".  As Additional layers were Placed on

the Shelf, the Studs Distorted the Keyhole Slots. ⑧  At
6½ Layers (6,778#---6,700# = rated capacity) Distortion was
Objectionable.

⑧  Bent Out At

Rated Load

⑨ At 7-Layers (slightly over rated Load) Deforming Continued
Over a Period of Time -- Did Not Stop!!  In 1 3/4 Hours, the
Studs "Dug In" to the post .017"and had not stopped.
(The Keyholes were Bending Outward).

Moral: The 16 Gage Post is GROSSLY INADEQUATE!!
Rack was Dismantled, and Keyholes had Suffered Permanent
Damage At Rated Load. (Not supposed to Happen until 1.65
Rated Load).

(A) Pair of Bars were Loaded to 12-Layers (12,420#) which
Approximates 1.65 Times Rated Load (10) Keyhole Bending
was so Great that Rack was Rendered Unusable.

(STRUCTURALLY, THIS RACK IS A CATASTROPHE).

Herb Klein
Chief Engineer

A More Detailed Report with Steel & Post Lab Test Analysis
Will Follow.